# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 98-3816, 99-1334

_____

| | | |
|---|---|---|
| Christopher J. Petrovic, Janet Hunter, Elizabeth Marie Ramirez, Mike Richards, Jimmie L. Van Bibber, and Barbara Chappell, Individually and as Class Representatives, | * * * * * * | |
| Appellants, and | * * | |
| City of Independence, City of Sugar Creek, Jean Stewart, Lyle Jackson, Marcella Jackson, John Brockman, Elberta Brockman, Dorothy J. Brockman, Billy Copeland, Virginia Copeland, Bill Stevens, Janeth Stevens, Thomas Larkin, Janey Sturgis, Michael A. Rodak, Michael J. Carr, Lucille Carr, Helen C. Butkovich, Diane Hall, Paul A. Hedrick, Joyce Hedrick, Joseph D. Kenney, John W. Kimak, Nancy Kimak, Joseph M. Mikula, Sue Ellen Mikula, Mark O'Renick, Debbie O'Renick, Dan Salva, Amy Salva, Joseph M. Salva, Lora L. Salva, Vernon Steinmeyer, Betty Steinmeyer, and Charles Woods, | * * * * * * * * * * * * * * * * * | Appeals from the United States District Court for the Western District of Missouri. |
| Appellees, and | * * | |
| William Bailey, Vernon Baker, Debbie Bazzell, David Beebe, Nancy Beebe, Robert Behler, Ernest Bell, Lourine Bell, Robert Bledsoe, Debra Bledsoe, Gerald | * * * * | |

Boyle, Edward Buford, Jessie Buford, *
William Buford, Norie Buford, Billy *
Burke, Ila Burke, Doras Butkovich, *
Fabian Butkovich, Filip Butkovich, *
Gladys Butkovich, Joseph Butkovich, *
T. J. Butkovich, Dragica Butkovich, *
Philip Campbell, Catherine Campos, *
David Canzonere, Caroline Canzonere, *
Joseph Carter, Russell Clark, James Coffey, *
Susan Coffey, Jean Colona, Don *
Cook, Darel Cornelius, Debbie Cornelius, *
P. Jean Cornelius, Mark Cosgrove, *
Jerry Creek, Julie Creek, Irene *
Crnkovich, Michael Dale, Judy Dale, *
Richard Deihl, James Devasher, *
Stephanie Devasher, Emil Dykal, Claudia *
Dykal, Harold Echols, Sr.; and Karolyn *
Elliott, Jerry Elliott, Janet Elliott, Cheryl *
England, Herbert Fillmore, Lulua Fillmore, *
Larry Garland, Marjorie Garland, *
Frank Gibbs, John Grayham, Charlotte *
Grayham, William Green, Jacqueline Green, *
Charles Greer, Lynn Greer, Bill *
Haman, Carolyn Haman, Wilbur *
Hamilton, Helen Hamilton, Richard *
Hand, Marcia Haworth, Maxine Hedges, *
Helen Hedrick, John S. Hedrick, Dixie *
Hedrick, John B. Hedrick, Mary Hedrick, *
Joseph Hedrick, Jo Ann Hedrick, Rita *
Hardy Hortenstine, Saul Imiquez, *
Daniela Imiquez, June Jackson, Richard *
Jarrett, Margaret Jarrett, Deanna Kennedy, *
Mary King Kerns, Joe King, William *
James King, James William King, Joseph *
Kipper, Gary Krohm, Pearl Krohm, Ada *
Kulp, Marvyn Lawson, Clara Lewis, *
Hildred Light, Sara Mace, James Mansell, *

Mary Ann Mansell, Betty Jo McCord, &ast;
Park McClune, II; and Othello McDavitt, &ast;
John Mikulich, Sandra Mikulich, Linda &ast;
Mikulich, Elizabeth Miller, David Muncy, &ast;
Esther Muncy, Timothy James Myers, &ast;
Frank Noch, Betty Noch, Jerry Novak, &ast;
Joseph Olivarez, Janice Olivarez, John &ast;
Owings, Karen Owings, Hoyt Palmer, &ast;
Mary Palmer, Carole Park, William &ast;
Parson, Ruth Patterson, Frank Peljae, &ast;
Doris Peljae, Albert Petroski, William R. &ast;
Platt, Loye Rains, Dorothy Rains, Ray &ast;
Ryan, June Adele Rhoads, Leonard &ast;
Richards, Melissa Richards, Leonard Riley, &ast;
John Rittel, Roze Rittel, John Roach, &ast;
Charles Rogers, Janice Roper, Mike Roper, &ast;
Antonia Roper, Mike E. Roper, Ann Roper, &ast;
Peter J. Roper, R. J. Roper, Jr.; and Mary &ast;
Rozgay, Mireille Rundell, Clifford Sanders, &ast;
Margaret Sanders, Susan Shelby, Juanita &ast;
Slayton, Daniel Slayton, Jr.; and Terry &ast;
Slayton, Larry Smith, Mildred Smith, Zita &ast;
Stanard, F. W. Stanger, Lewayne Starks, &ast;
Clara Stephenson, Albert Stovich, &ast;
Laverna Stovich, Lex Swofford, Ellen &ast;
Swofford, Ronald Taylor, Ottilie &ast;
Thompson, Buelah Tolliver, Luva Vaughan, &ast;
Karl Vaughn, Sherralyn Vaughn, &ast;
Clifford Weakley, Angela Weikal, &ast;
Pamela White, Anna Wix, Kim &ast;
Wollenberg, Beula Fay Worley, &ast;
Clarence Worley, Jerry Wrabec, Leonard &ast;
Wrabec, Mary Wrabec, Steven Yslas, &ast;
Elizabeth Yslas, Jerry Zevecke, Janet &ast;

Zevecke, John Zevecke, Steve Zevecke,    *
and Janet Zevecke,    *

  *

        Appellants,    *

  *

    v.    *

  *

Amoco Oil Company,    *

  *

        Appellee.    *

  *

  *

  *

_____    *

  *

Thomas Hart Benton Group, Ozark Chapter,    *
Sierra Club,    *

  *

        Amicus Curiae on Behalf    *
        of Appellants.    *

_____

Submitted:  September 15, 1999

Filed:  December 30, 1999
_____

Before BOWMAN, LAY, and MORRIS SHEPPARD ARNOLD, Circuit Judges.
_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Christopher Petrovic and others brought a class action against Amoco Oil Company in which they sought injunctive and monetary relief for pollution to their property that allegedly occurred as a result of underground oil seepage originating from an Amoco petroleum refinery. The appellants in these cases are various plaintiff class

members who object to the approval of the settlement of this class action and to other orders entered by the district court[1] over the course of the litigation.

The objectors argue that the district court's failure to divide the certified class into subclasses deprived them of adequate representation, that the settlement agreement was not fair, adequate, and reasonable, that the notice of settlement fell short of the requirements of Fed. R. Civ. P. 23(d)(2) and Fed. R. Civ. P. 23(e), and that the district court erred in granting Amoco's motion for summary judgment on the plaintiffs' claims under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), see 42 U.S.C. §§ 9601-9675. The objectors also maintain that the district court erred in disqualifying one of the original class counsel and in refusing to award attorney fees and costs to that counsel, that the district court's award of attorney fees to the other class counsel was excessive, and that the district court wrongly denied some of the objectors' motions to intervene in the case so that they could appeal with respect to the certification of the class and the approval of the settlement. For the reasons set forth below, we affirm the district court in all respects.

I.

The settlement agreement provides both injunctive and compensatory relief to the class, which contains more than 5,000 members. With respect to the compensatory benefits, the settlement agreement divides the affected properties into three groups. The owners of the 129 properties in "Zone A," which are situated above the underground oil, are guaranteed to receive 54 percent of the value of their properties. The owners of the 373 properties in "Zone B," which surrounds Zone A, are guaranteed to receive $1,300 per property. The owners of the approximately 5,000 properties in "Zone C," the area farthest removed from the underground oil, receive no guaranteed compensation, but have access to a "special circumstances" fund to which they, along

---

[1]The Honorable Fernando J. Gaitan, United States District Judge for the Western District of Missouri.

with all other property owners, can apply for compensation if they can demonstrate damage. The objectors contend that the interests of the various property owners are at odds with each other and, therefore, that the district court should have separated the class into multiple subclasses, each with its own counsel.

A district court has a duty to assure that a class once certified continues to be certifiable under Fed. R. Civ. P. 23(a). See Hervey v. City of Little Rock, 787 F.2d 1223, 1227 (8th Cir. 1986). A district court must reconsider a ruling certifying a class, for instance, if a subsequent development creates a conflict of interest that prevents the representative party from fairly and adequately protecting the interests of all of the class members. See Boucher v. Syracuse University, 164 F.3d 113, 118-19 (2nd Cir. 1999). While the docket does not indicate that the objectors made a formal motion to decertify or to divide the class, during a hearing on the fairness of the settlement they did advocate separating the class into subclasses or, in the alternative, decertifying the class. We believe that this was sufficient to preserve the right of the objectors to contest the class certification on appeal. See In re Dennis Greenman Securities Litigation, 829 F.2d 1539, 1542-43 (11th Cir. 1987); cf. Barney v. Holzer Clinic, Ltd., 110 F.3d 1207, 1213 (6th Cir. 1997).

It is within the discretion of a district court to determine whether the class action device is appropriate, and we review that decision only for an abuse of discretion. See Belles v. Schweiker, 720 F.2d 509, 515 (8th Cir. 1983). We recognize, as the objectors have pointed out, that the Supreme Court has stated that "other specifications of [Fed. R. Civ. P. 23] -- those designed to protect absentees by blocking unwarranted or overbroad class definitions -- demand undiluted, even heightened, attention in the settlement context." Amchem Products, Inc. v. Windsor, 521 U.S. 591, 620 (1997); see also Ortiz v. Fibreboard Corporation, 119 S. Ct. 2295, 2316 (1999). We believe, however, that the circumstances in Amchem and Ortiz that called for heightened attention to the requirements of Fed. R. Civ. P. 23(a) are not present in our case.

Amchem, 521 U.S. at 601-02, and Ortiz, 119 S. Ct. at 2305, each involved a situation in which the parties agreed upon a class definition and a settlement before formally initiating litigation, and then presented the district court with the complaint, proposed class, and proposed settlement. The difficulty inherent in such a situation is that the district court "lack[s] the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." Amchem, 521 U.S. at 620. In our case, however, the parties engaged in more than three years of extensive discovery and preparation for trial, and the class was certified under Fed. R. Civ. P. 23(b)(3) many months before the parties reached the settlement. Indeed, the settlement was reached on the eve of trial.

The difficulties associated with settlements like those in Amchem and Ortiz -- the possibility of "collusion between class counsel and the defendant ... [and] the need for additional protections when the settlement is not negotiated by a court designated class representative," Hanlon v. Chrysler Corporation, 150 F.3d 1011, 1026 (9th Cir. 1998) -- are therefore not present here. Although a mandatory class was also certified for purposes of injunctive relief in connection with the settlement in our case, we think that this additional certification lacks legal significance in this context. The district court still had the benefit of the parties' extensive trial preparation, and the definition of the mandatory class was the same as the definition of the class originally certified under Fed. R. Civ. P. 23(b)(3) (although, obviously, the mandatory class also included those who opted out of the class litigation with respect to compensatory relief).

Keeping the appropriate deferential standard of review in mind, we turn now to the merits of the objectors' position. They appear to make two arguments in support of subdividing the class. They argue first that the boundaries of the zones were arbitrarily and inaccurately established. They also challenge the propriety of the award of compensation to the holders of property in Zone A, which was far greater than the compensation to the holders of property in Zone B, which in turn was far greater than the compensation to holders of property in Zone C. It appears to us, however, that both

-7-

of these arguments are more properly directed to the objectors' contention that the settlement was not fair, adequate, and reasonable.  Although the extent of the pollution varied from property to property, possibly necessitating different awards of damages, the objectors do not clearly explain why the remedial interests of the class members are in conflict.

If the objectors mean to maintain that a conflict of interest requiring subdivision is created when some class members receive more than other class members in a settlement, we think that the argument is untenable.  It seems to us that almost every settlement will involve different awards for various class members.  Indeed, even if every class member were to receive an identical monetary award in settlement, the true compensation would still vary from member to member since risk tolerance varies from person to person (*i.e.*, a more risk-averse class member would place a greater premium on the certainty of a settlement award than a less risk-averse class member would).

We also do not believe, as the objectors suggest, that the stark conflicts of interest that the Supreme Court discerned in Amchem and Ortiz are present here.  In those cases the Court found that a conflict existed between class members who already had asbestos-related injuries (and who would want to maximize immediate payout) and class members who might develop asbestos-related injuries in the future (and who would want to maximize testing, protection from inflation, and future fund size).  See Amchem, 521 U.S. at 626, and Ortiz, 119 S. Ct. 2319-20.  We note that the injuries involved in those cases were extraordinarily various, both in terms of the harm sustained and the duration endured.  Our case, on the other hand, involves a discrete and identified class that has suffered a harm the extent of which has largely been ascertained.

During oral argument, the objectors suggested that the underground oil is migrating, and therefore that the danger in this case is analogous to the danger of latent asbestos exposure.  The danger, it seems to us, turns on a matter of degree, however,

and we do not think that the district court abused its discretion in finding that the conflict of interest here, if any, failed to rise to a level at which the concerns expressed in Amchem and Ortiz would become applicable. Cf. DeBoer v. Mellon Mortgage Co., 64 F.3d 1171, 1175 (8th Cir. 1995), cert. denied, 517 U.S. 1156 (1996) (noting that the class representatives fairly and adequately represented the class where there was no indication that their interests were antagonistic to the remainder of the class or that the claims were not vigorously pursued). The district court found, moreover, that it was "not likely" that there would be significant migration of the underground oil plume, a finding that is not clearly erroneous.

Nor do we believe that the other cases cited by the objectors -- In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation, 55 F.3d 768 (3rd Cir. 1995), cert. denied, 516 U.S. 824 (1995), and Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331 (4th Cir. 1998) -- are apposite. First, as Amoco and the class counsel point out, the class in each of those cases included distinct subgroups of plaintiffs, but all of the class representatives in each case came from only one of the subgroups. See General Motors Corp., 55 F.3d at 800-01, and Broussard, 155 F.3d at 337-39. In our case, on the other hand, the 33 class representatives included owners of property located in a variety of locations, including all three compensation zones.

Second, we believe that the remedial interests of the various class members differed to a much greater extent in General Motors Corp. and Broussard than in our case. The plaintiff class in General Motors Corp., 55 F.3d at 779, included owners of individual pickup trucks and owners of fleets of pickup trucks. The settlement agreed to by the class representatives, all of whom were owners of individual pickup trucks, provided vouchers for $1,000 toward the purchase of a new pickup truck as the primary compensation to the class. See id. at 780. The use restrictions on these vouchers, however, rendered them substantially less valuable to owners of large fleets of trucks. See id. at 781. The "structural assurance" of adequate representation required by Amchem, 521 U.S. at 627, was not present because none of the class representatives

was a fleet owner, and because the purchasing and replacement needs of the fleet owners were much different from the needs of the individual owners.  See General Motors Corp., 55 F.3d at 801, 808-09.

The internal conflict was even more patent in the class certified in Broussard. The class members in that case were current and former franchisees of Meineke Discount Mufflers who were suing Meineke for breach of contract.  See Broussard, 155 F.3d at 334, 338.  Included in this class was a large group of current franchisees who signed a waiver giving up their rights personally to recover any damages from the alleged breach of contract.  See id. at 336, 338.  The Broussard court found that two subgroups of the class were in obvious conflict:  the current franchisees who signed the waiver and the former franchisees.  See id. at 338.  The current franchisees who signed the waiver had nothing to gain from a large damages award payable to the class members, and would be harmed by a judgment that adversely affected Meineke (with whom they had an ongoing franchisor-franchisee relationship).  See id.  The former franchisees, on the other hand, directly benefited from a large damages award payable to the class, and had no incentive to keep Meineke financially healthy.  See id.

We see no analogous conflict in our case.  Each property owner stands to gain from Amoco's agreement to compensate landowners for damage already sustained to property, and from Amoco's undertaking steps to revitalize the community and to increase property values.   All property owners have access to the "special circumstances" fund, to which they may make an application for compensation if they feel that they have suffered any damage as a result of the pollution from Amoco's refinery.  The substantial difference in remedial needs seen in General Motors Corp. and Broussard are simply not present here.

We note in passing that during oral argument the objectors provided an additional justification for subdivision that they raised below but did not raise in their brief on appeal.   Two of the plaintiffs in the consolidated litigation were the

municipalities in which the polluted land was located. As part of the settlement agreement, Amoco granted an easement to the municipalities to construct and maintain a major roadway on Amoco's property, and Amoco indemnified the municipalities from any related environmental liabilities that might arise from the construction. The objectors argue that obtaining these concessions was the only motivating factor for the municipalities, and that such a motivation is too far removed from the motivations of the other class members.

The interests of the various plaintiffs do not have to be identical to the interests of every class member; it is enough that they "share common objectives and legal or factual positions," see 7A Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 1769 at 367 (2d ed. 1986). We note that the municipalities are not members of the class, and that they have separate counsel. In this case, moreover, all of the plaintiffs seek essentially the same things: compensation for damage already incurred, restoration of property values to the extent possible, and preventive steps to limit the scope of future damage.

Both the municipalities and the individual property owners stand to gain from Amoco's cooperation in the construction of the new roadway and the anticipated community revitalization and increased property values. Similarly, both the individual property owners and the municipalities stand to gain from Amoco's taking remedial steps to clean up the pollution and restore the usability (both real and perceived) of the land. We do not think that the district court abused its discretion in failing to find that the participation of the municipalities created a conflict of interest among the plaintiffs.

II.

The objectors assert that the settlement agreement approved by the district court is not "fair, reasonable, and adequate," In re Flight Transportation Corporation Securities Litigation, 730 F.2d 1128, 1135 (8th Cir. 1984), cert. denied, 469 U.S. 1207 (1985), as Fed. R. Civ. P. 23 requires. "The district court's assessment as to the

-11-

reasonableness of a settlement 'will not be overturned unless the party challenging the settlement clearly shows that the district court abused its discretion.' " DeBoer, 64 F.3d at 1176-77, quoting Van Horn v. Trickey, 840 F.2d 604, 607 (8th Cir. 1988).

Two justifications are typically offered for this deferential standard of review. First, " '[g]reat weight is accorded [to the trial court's] views because [it] is exposed to the litigants, and their strategies, positions and proofs.' " Grunin v. International House of Pancakes, 513 F.2d 114, 123 (8th Cir. 1975), cert. denied, 423 U.S. 864 (1975), quoting Ace Heating and Plumbing Co. v. Crane Co., 453 F.2d 30, 34 (3rd Cir. 1971). Second, "[a] strong public policy favors agreements, and courts should approach them with a presumption in their favor." Little Rock School District v. Pulaski County Special School District No. 1, 921 F.2d 1371, 1388 (8th Cir. 1990). Although a trial court must consider the terms of a class action settlement to the extent necessary to protect the interests of the class, "[j]udges should not substitute their own judgment as to optimal settlement terms for the judgment of the litigants and their counsel." Armstrong v. Board of School Directors, 616 F.2d 305, 315 (7th Cir. 1980), overruled on different grounds, Felzen v. Andreas, 134 F.3d 873, 875 (7th Cir. 1998).

The objectors recognize that approvals of settlements are ordinarily treated with deference, but contend that we should engage in a heightened level of scrutiny in this case for three reasons. First, they assert that the covenants in the settlement agreement limit the ability of the class members to bring future suits against Amoco and various governmental agencies, which is against public policy, a fact that the district court failed to recognize, they say. It seems to us, however, that even if the district court misconstrued a provision of the settlement agreement, the standard of review would not change; we simply would not defer to the district court's point of view on that particular provision. Cf. Wiener v. Roth, 791 F.2d 661, 662 (8th Cir. 1986) (per curiam) (application of incorrect state law not necessarily ground for reversing district court's approval of settlement or changing standard of review). We also do not read Angela R. v. Clinton, 999 F.2d 320, 324 (8th Cir. 1993), on which the objectors rely, to say that

consent decrees that limit the ability of citizens to enforce statutory rights are subject to a more exacting standard of review than other such decrees. Angela R. itself, 999 F.2d at 325, which involved an extraordinarily far-reaching consent decree with a governmental agency, applied an abuse of discretion standard.

Indeed, another case to which the objectors refer us seems to run strongly contrary to their argument. In United States v. City of Alexandria, 614 F.2d 1358, 1361 (5th Cir. 1980), the court noted that an abuse of discretion standard generally applies to appellate review of judicial approvals of consent decrees. Although the City of Alexandria court, id. at 1361-62, decided instead to apply heightened scrutiny, it did so because the district court had rejected the consent decree. The court explained that the "public policy in favor of voluntary settlements" would be undermined by a standard that gave district courts too much discretion to reject them. Id. at 1362. The rationale supporting heightened scrutiny in City of Alexandria, namely, the public policy favoring settlements, does not apply, of course, when, as here, a district court approves a consent decree.

The objectors also assert that the customary deference should not be accorded in this case because the district court did not conduct an evidentiary hearing prior to making its ruling on the proposed settlement. We note, however, that the district court explained its approval of the settlement in exquisite detail and included supporting facts, unlike the lower courts in the cases relied on by the objectors. See Stovall v. City of Cocoa, 117 F.3d 1238, 1241, 1244 (11th Cir. 1997), and City of Alexandria, 614 F.2d at 1360. We also point out that each of these cases involved a situation in which the lower court denied the proposed consent decree, a circumstance that triggered the heightened scrutiny in those cases. See Stovall, 117 F.3d at 1240-41, and City of Alexandria, 614 F.2d at 1360.

The parties in our case, prior to reaching a settlement, engaged in extensive discovery, argued numerous motions (including motions for summary judgment and for

-13-

class certification), and in so doing submitted voluminous supporting memoranda with citations to affidavits and deposition testimony. Under these circumstances, and recognizing that the purpose of a settlement is to avoid the expense and delay of a trial, we do not believe that the district court's order should be given greater scrutiny simply because the court did not allow evidence to be presented at the fairness hearing. See DeBoer, 64 F.3d at 1176-78; see also Van Horn, 840 F.2d at 606.

The objectors argue finally that heightened scrutiny of the district court's order is required because the court's order was a virtually verbatim adoption of the proposed order offered by Amoco and the class counsel. We have held, however, that even a verbatim adoption of proposed findings of fact does not change the standard of review. See Jones v. International Paper Co., 720 F.2d 496, 499 (8th Cir. 1983). We agree with the objectors that verbatim adoption of proposed findings of fact and rulings of law ought ordinarily to be avoided, as such a practice can obfuscate the extent to which the order was the "product of personal analysis and interpretation by the trial judge," id. But we note that the district court in our case rejected several pages of findings proposed by Amoco and the class counsel, an act that reflects more than just a cursory analysis and interpretation. See McDowell v. Safeway Stores, Inc., 753 F.2d 716, 717-18 (8th Cir. 1985). We are also moved somewhat by the argument that where the facts of a case are complex, "practical considerations justify the judge's decision not to rewrite those findings which are accepted as proper," id. at 718.

With a deferential standard of review therefore again in mind, we turn to the merits of the objectors' argument that the proposed settlement is not fair, reasonable, and adequate. The most important consideration in this context is " 'the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement.' " Grunin, 513 F.2d at 124, quoting West Virginia v. Charles Pfizer and Company, Inc., 314 F. Supp. 710, 740 (S.D. N.Y. 1970), aff'd, 440 F.2d 1079 (2d Cir. 1971), cert. denied, 404 U.S. 871 (1971). With regard to the monetary compensation, the objectors note that two members of the class who opted out and pursued their claims individually

were later victorious and received an award far greater than what was guaranteed in the settlement. See Slayton v. Amoco Oil Co., No. CV97-14626, slip op. at 3-4 (Jackson County, Mo., Cir. Ct. Feb. 5, 1999) (unpublished) (awarding 50 percent of the property value in compensatory damages for contaminated property, and $500,000 in punitive damages, to each plaintiff). We note, however, that under the settlement the owners of property in Zone A receive significantly more in monetary compensatory damages: 54 percent of the property value, net of attorney fees and costs. Although the Slayton plaintiffs ultimately received an amount of punitive damages that outweighed the shortfall in compensatory damages, we do not believe that the speculative possibility of punitive damages (the Slayton case was not yet decided when the district court ruled on the proposed settlement) is enough to find that the district court abused its discretion in approving the settlement.

We also reject the contention that the injunctive relief that the class received is inadequate. To begin with, we believe that it was far from certain that the class would receive any injunctive relief at all. At the time of settlement, the class had only two remaining avenues through which injunctive relief could be achieved: a claim under the Resource Conservation and Reclamation Act (RCRA), see 42 U.S.C. §§ 6901-6992k, and the trespass claims of a few class members (Amoco had already been granted summary judgment on the trespass claims of the vast majority of the class). Given the findings of fact by the district court, we believe that the likelihood that the objectors would receive injunctive relief at trial was quite small.

To receive injunctive relief under RCRA, the class had to demonstrate that Amoco's handling of solid or hazardous waste created an "imminent and substantial endangerment to health or the environment," see 42 U.S.C. § 6972(a)(1)(B). The district court in this case specifically found that the petroleum constituents were located many feet below the ground, and only in low concentrations. The district court also noted that the area residents did not use the underground water as a drinking source, and that there was no substantial risk of personal injury or harm to the environment.

Although the objectors point to some conflicting evidence, we do not believe that the court's findings are clearly erroneous. It seems unlikely, therefore, that the class would be able to make the required showing that there is "a threat which is present <u>now</u>" (emphasis in original), <u>Price v. United States Navy</u>, 39 F.3d 1011, 1019 (9th Cir. 1994), and that "the potential for harm is great," <u>United States v. Aceto Agricultural Chemicals Corp.</u>, 872 F.2d 1373, 1383 (8th Cir. 1989). For the same reasons, it is also unlikely that an injunctive remedy would be awarded on the individual trespass or nuisance claims. <u>See</u> <u>Williams v. Monsanto Co.</u>, 856 S.W.2d 338, 340 (Mo. Ct. App. 1993) ("[f]or trespass to lie the pollution must be at a level so as to constitute an actual interference with the possession of the land").

As part of the settlement agreement Amoco agreed to take various steps to contain and remediate the underground oil, to test the purity of the community drinking water in the future, to work with the community to facilitate the reuse of the contaminated property, and to make concessions to local governments so that a roadway could be built. Although the objectors contest the effectiveness of the various measures, they do not convince us that the district court abused its discretion in approving the settlement, particularly given what were, to say the least, the very limited prospects of injunctive relief.

The objectors also assert that the settlement agreement is unacceptable because it contains what they characterize as an unreasonable "gag order." In the agreement, the class members covenant not to "commence or prosecute any civil judicial, administrative, regulatory or other suit, action, claim, complaint ... whatsoever in any jurisdiction ... based in whole or in part on the Claims released." The objectors contend that this covenant is both unreasonable and unconstitutional because it prevents class members from complaining to and suing administrative agencies for failure to enforce environmental laws.

We disagree with both the objectors' interpretation of the covenant and their assessment of its reasonableness. First, we note that the "[c]laims released" referred to in the covenant not to sue must necessarily be only those claims held by class members against Amoco. We do not believe that a suit against a third-party governmental agency relating to that agency's failure to enforce environmental regulations in the affected area would be "based in whole or in part" on the claims of the class members against Amoco.

Any potential ambiguity that exists is eliminated by the repeated statements in the appellate briefs of both Amoco and the class counsel, the drafters of the contract, that the "covenant plainly does not preclude class members from petitioning or suing ... any third-party [] concerning the cleanup." Cf. J. S. DeWeese Co. v. Hughes-Treitler Manufacturing Corp., 881 S.W.2d 638, 644 (Mo. Ct. App. 1994) (permitting extrinsic evidence to resolve ambiguities). The agreement simply does not provide any direct protection or immunity to environmental regulatory agencies whatsoever: It neither explicitly nor implicitly designates any third-party beneficiaries, and no governmental agency could use the covenant not to sue as a defense, as the objectors suggested during oral argument.

The objectors, moreover, ignore the second sentence of the covenant not to sue,which provides that "[r]eleasors are not precluded from seeking enforcement of this Agreement and its provisions." Since Amoco agrees elsewhere in the settlement to "perform any environmental remediation ... required ... by any court ... or any other state or federal agency," and to take "all reasonable measures to comply with current or future orders of ... federal or state environmental regulatory agencies," it seems apparent to us that the class members will be able to take any complaints about Amoco's compliance directly to the district court. As the class counsel points out, this approach may have distinct advantages over seeking administrative relief, given the powers available to the district court to enforce its orders.

The objectors' next difficulty with the settlement agreement is that the outline of the compensation zones is allegedly arbitrary and leads to disproportionate results. Although we agree that unfairly disparate treatment of class members runs contrary to Fed. R. Civ. P. 23, see Lurns v. Russell Corp., 604 F.Supp. 1335, 1336 (M.D. Ala. 1984), but see also Holmes v. Continental Can Co., 706 F.2d 1144, 1148 (11th Cir. 1983) ("there is no rule that settlements [must] benefit all class members equally"), we do not believe that any subgroup of this class was treated unfairly. The objectors contend that underground oil contaminated certain properties in Zone B, and therefore that the wide disparity between Zone A and Zone B compensation is not reasonable. With regard to the existence of contamination in Zone B, however, the district court explicitly considered and rejected the evidence offered by the objectors, finding more credible the evidence of contamination used to designate the zone boundaries. We do not believe that the district court clearly erred in its factual findings.

The objectors also argue that the relief given to owners of property in Zone C is wholly inadequate. It seems to us, however, that the district court could reasonably conclude, as it did, that the owners of property in Zone C receive significant benefits from the community revitalization efforts, the monitoring of wells, and remediation efforts that Amoco agreed to undertake. Although the objectors complain that owners of property in Zone C are subjected to easements on their land to facilitate the cleanup, this "cost" is proportionately offset by the benefit creating the cost, namely, environmental cleanup. To the extent that there is no cleanup, there is no infringement on property rights, and the Zone C property owners still benefit from the community revitalization activities and the de-stigmatization of the area.

In addition to assessing the relative merits of the plaintiffs' claims, a court, in examining the compensation provided by a settlement, should consider the defendant's ability to pay, the anticipated length and complexity of further litigation, and the amount of opposition to the settlement. Grunin, 513 F.2d at 124. In this case, the district court explicitly considered all of these matters and found that they did not require the

settlement to be disapproved. We agree with the district court's evaluation of the relevant considerations.

While it is undisputed that Amoco could pay more than it is paying in this settlement, this fact, standing alone, does not render the settlement inadequate. Although this case was settled on the eve of trial, significant further litigation, both in a trial projected to last at least a few weeks and in the inevitable appeals, would be needed to resolve the case. Finally, fewer than 4 percent of the class members objected to the settlement, significantly fewer than the number of objectors to other settlements that have been approved. See Van Horn, 840 F.2d at 606. Although we agree that the "vociferous[ness]" of the objectors, General Motors Corp., 55 F.3d at 812, should also be considered, and that the objectors in our case have indeed vigorously objected to the settlement, we do not believe that disapproval of the settlement is warranted here. See County of Suffolk v. Long Island Lighting Co., 907 F.2d 1295, 1325 (2nd Cir. 1990).

### III.

The objectors also complain that the notice of the settlement sent to the class members violated the requirements of Fed. R. Civ. P. 23(d)(2) and Fed. R. Civ. P. 23(e), see also Fed. R. Civ. P. 23(c)(2), because it did not adequately describe the settlement's terms. They emphasize that while the notice of settlement stated the maximum aggregate amount that Amoco would pay to the class as a whole, it did not say how this amount would be distributed among the individual members of the class.

Under Fed. R. Civ. P. 23(e), the district court directs the form of the notice of settlement, and the notice need only satisfy the "broad 'reasonableness' standards imposed by due process." Grunin, 513 F.2d at 121. The Supreme Court has found that the notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Central Hanover Bank and Trust Co., 339 U.S. 306, 314 (1950). The notice in this case unquestionably alerted the recipients that they

-19-

were members of a pending class action, that a settlement had been proposed, and that they had the right to state their objections at a fairness hearing.

We recognize that the information provided to the class members in the notice must be structured "in a manner that enables class members rationally to decide whether they should intervene in the settlement proceedings or otherwise make their views known." Reynolds v. National Football League, 584 F.2d 280, 285 (8th Cir. 1978). Under Reynolds, 584 F.2d at 285, the notice of settlement must be sufficiently detailed to permit class members to determine the potential costs and benefits involved, or at least whether additional investigation into the matter would be an efficient use of their time. This standard has been met here. The notice described with sufficient particularity the stakes involved: the settlement of environmental claims against Amoco, the award of significant injunctive relief, and the potential aggregate payout of over seven million dollars in compensatory damages. Significantly, the notice also provided a telephone number that the class members could call for more information. See In re Prudential Insurance Co., 148 F.3d 283, 328 (3rd Cir. 1998), cert. denied, 119 S. Ct. 890 (1999) (approving use of "800" number in scheme of notice).

We do not agree with the objectors' contention that a mailed notice of settlement must contain a formula for calculating individual awards. It is well settled that the notice " 'is not required to provide a complete source of information.' " DeBoer, 64 F.3d at 1176, quoting Maher v. Zapata Corp., 714 F.2d 436, 452 (5th Cir. 1983). The weight of authority rejects the proposition that a specific formula must always be included in the notice. See Grunin, 513 F.2d at 122 (finding that a notice "may consist of a very general description of the proposed settlement"); see also In re "Agent Orange" Product Liability Litigation, 818 F.2d 145, 170 (2nd Cir. 1987), cert. denied, 484 U.S. 1004 (1988). In our case the mailed notice provided a reasonable summary of the stakes of the litigation, and class members could easily acquire more detailed information, including data on potential individual awards, through the telephone number that was provided. Due process requires no more.

IV.

The objectors next dispute the district court's grant of summary judgment for Amoco on the claim that the class made under CERCLA. Assuming, arguendo, that the objectors may properly raise this issue in an appeal from the approval of a class action settlement, we find that the district court's grant of summary judgment to Amoco on that claim was proper.

CERCLA generally provides a cause of action to a private person, see 42 U.S.C. § 9659(a)(1), seeking relief from another person, see 42 U.S.C. § 9607(a), who has caused a "hazardous substance," see 42 U.S.C. § 9601(14), to pollute an area. The plaintiffs' CERCLA claim alleged that Amoco had caused hazardous substances to contaminate property owned by the class members. The statute, however, specifically excludes "petroleum" from the definition of "hazardous substance." See id. This "petroleum exclusion" has been interpreted to apply to "unrefined and refined gasoline even though certain of its indigenous components and certain additives during the refining process have themselves been designated as hazardous substances." Wilshire Westwood Associates v. Atlantic Richfield Corp., 881 F.2d 801, 810 (9th Cir. 1989); see also Cose v. Getty Oil Co., 4 F.3d 700, 704 (9th Cir. 1993). The district court found that all of the contaminants involved in this case fell within the petroleum exclusion, and therefore that the class had no cause of action against Amoco under CERCLA.

We review a grant of summary judgment de novo, and draw all reasonable inferences in favor of the nonmoving party. See Wallin v. Minnesota Department of Corrections, 153 F.3d 681, 686 (8th Cir. 1998). In our case, experts retained by both sides stated that the pollution plume consisted of refined and unrefined petroleum hydrocarbon products. Although the class provides some evidence that various hazardous substances are found in the soil, it fails to offer any evidence to refute the

findings of Amoco's expert and of its own expert that the hazardous substances found are constituents of crude oil or refined petroleum products.

On appeal the objectors contend that the hazardous substances that they claim are present "are not found naturally in petroleum," but cite nothing in the record to support that conclusory statement. Even if we give full credence to the evidence that the objectors claim demonstrates the presence of hazardous substances, therefore, a grant of summary judgment to Amoco on the CERCLA claims is appropriate, as no fact finder could reasonably conclude that the petroleum exception does not apply.

V.

The objectors also appeal from the district court's disqualification of one of the original class counsel. The district court found that an impermissible conflict of interest was created by the fact that two of the class representatives were close relatives (the husband and a sister-in-law) of a partner in the firm in question. "The decision to grant or deny a motion to disqualify an attorney rests in the discretion of the [district] court, and we will reverse this determination only upon a showing of abuse of that discretion." Harker v. Commissioner, 82 F.3d 806, 808 (8th Cir. 1996). "When reviewing [the] decision of a district court on a motion for disqualification of an attorney, we apply the same rules governing the professional conduct of attorneys that the district court ... adopted." Id. The Western District of Missouri follows the Rules of Professional Conduct adopted by the Missouri Supreme Court. See W.D. Mo. Local R. 83.5(c)(2). The Missouri Supreme Court, in turn, adopts the Rules of Professional Conduct of the American Bar Association. See Mo. S. Ct. R. 4.

Whether an impermissible conflict of interest is present when a class counsel is a close relative of a class representative is a question of first impression in our circuit. A survey of the case law of other jurisdictions reveals a difference of opinion, compare Zylstra v. Safeway Stores, Inc., 578 F.2d 102, 104 (5th Cir. 1978), Susman v. Lincoln American Corp., 561 F.2d 86, 90, 96 (7th Cir. 1977), Zlotnick v. TIE Communications,

Inc., 123 F.R.D. 189, 194 (E.D. Pa. 1988) (close familial relationship between class counsel and class representative inappropriate), with Werlinger v. Champion Healthcare Corp., 598 N.W.2d 820, 827-28 (N.D. 1999), In re Greenwich Pharmaceuticals Securities Litigation, No. 92-3071, 1993 WL 436031, at *2 (E.D. Pa. Oct. 25, 1993) (unpublished) (familial relation between class counsel and class representative allowed).

The objectors contend that all of the cases relied on by Amoco were following Canon 9 of the Canons of Ethics, which were part of the Code of Professional Responsibility, and which prohibited even the "appearance of impropriety." The Rules of Professional Conduct, which supplanted the Code of Professional Responsibility in 1986, do not, however, contain the language of Canon 9. The most applicable current stricture is Rule 1.7of the Rules of Professional Conduct, which prohibits a lawyer from representing a client if the representation of that client will be either directly adverse to another client or materially limited by the lawyer's own interests.

We have held that cases applying the "appearance of impropriety" standard found in the Canons of Ethics do not govern our review of decisions applying the Rules of Professional Conduct. Harker, 82 F.3d at 808-09. We believe, however, that the rationale of Zylstra is also applicable in jurisdictions applying the Rules of Professional Conduct. The Zylstra court, 578 F.2d at 104, found that "there is a reasonable possibility that some specifically identifiable impropriety will occur" when a class counsel is closely related to a class representative. See also Phillips v. Joint Legislative Committee, 637 F.2d 1014, 1023 (5th Cir. 1981), cert. denied, 456 U.S. 960, 971 (1982). We agree with the Fifth Circuit on this point.

In situations where there is a close familial bond between a class counsel and a class representative, it seems to us that there is a clear danger that the representative may have some interests in conflict with the best interests of the class as a whole when making decisions that could have an impact on attorney fees. The "appearance of

-23-

impropriety" language in <u>Zylstra</u> does not lessen its holding that a conflict of interest exists when a class counsel and a class representative are closely related.  The lack of a prohibition on the "appearance of impropriety" in the Rules of Professional Conduct does not "alter the underlying principle that an attorney owes undivided loyalty to the client."  <u>In re Allstate Ins. Co.</u>, 722 S.W.2d 947, 951 (Mo. 1987) (<u>en banc</u>).  We believe, therefore, that a district court applying the Rules of Professional Conduct may grant a motion for disqualification if there is a close familial relationship between the class counsel and a class representative.

We also disagree with the objectors' contention that the district court erroneously relied on the "appearance of impropriety" standard in reaching its conclusion.  The district court's order explicitly cited to Rule 1.7 of the Rules of Professional Conduct and correctly found that the rationale of cases like <u>Zylstra</u> and <u>Susman</u> was applicable in a conflict-of-interest analysis.  Although we do not hold that a close familial relationship between a class counsel and a class representative necessarily calls for disqualification, we do not believe that the district court abused its discretion in finding an impermissible conflict of interest here.  The disqualification of the entire firm in question, instead of only the relevant partner, was also proper.  <u>See</u> Mo. S. Ct. R. 4-1.10(a) ("[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by [Rule 1.7]").

The final argument of the objectors is that even if there were an improper relationship between the class counsel in question and two of the class representatives, this difficulty was cured when the two representatives became class members only.  The district court rejected this argument, finding that one of the removed representatives remained a "de facto class representative" even after her formal status was changed from "representative" to "member."

We agree that a class member may exert such influence over class representatives and other class members as to be found a "de facto representative" for the purposes of granting a motion to disqualify. See Fechter v. HMV Industries, 117 F.R.D. 362, 364 (E.D. Pa. 1987). The danger of biased decision-making is not necessarily cured by simply changing a person's title from "class representative" to "class member"; disqualification may still be appropriate if the class member continues to exert a significant influence. The record in this case indicates that Carole Park, a prominent member of the community, played a very active role in the initiation of the lawsuit and in subsequent litigation. It is also worth noting that the firm in question brought this suit with not one but two class representatives who were closely related to the relevant partner and was not very forthcoming with that information. Under these circumstances, we do not believe that the district court abused its discretion when it found that although Ms. Park's status changed from representative to member, "nothing [] changed except a label."

## VI.

The objectors contend that even if the dismissal of the firm in question was proper, the district court erred in refusing to award attorney fees and costs for work performed by that firm before and after disqualification. We disagree.

Decisions of the district court regarding attorney fees in a class action settlement will generally be set aside only upon a showing that the action amounted to an abuse of discretion. See Grunin, 513 F.2d at 126. As discussed above, the Western District of Missouri adopts the definition of "misconduct" that appears in the Rules of Professional Conduct of the Missouri Supreme Court. Once misconduct has been found, an attorney admitted to practice before the federal court may be disbarred, reprimanded, or "subjected to such other disciplinary action as the circumstances warrant." See W.D. Mo. R. 83.5(c)(1).

In this case, the district court explicitly found that the conflict of interest of the firm in question constituted a serious violation of the firm's duty to the class, and that such a violation required the termination of the firm's employment. Under these circumstances, the district court could properly deny the firm any recovery for services rendered prior to the disqualification, even if those services conferred some benefit on the class. We do not believe that this result is overly harsh or incongruent with the law of other jurisdictions. For example, the Missouri Supreme Court found that a complete forfeiture of fees is warranted when "a lawyer's clear and serious violation of a duty to a client is found to have destroyed the client-lawyer relationship." International Materials Corp. v. Sun Corporation, Inc., 824 S.W.2d 890, 895 (Mo. 1992) (en banc).

The district court's denial of attorney fees and costs for services rendered after disqualification of the relevant firm was also proper. To recover fees from a common fund, attorneys must demonstrate that their services were of some benefit to the fund or enhanced the adversarial process. See Elliott v. Sperry Rand Corp., 680 F.2d 1225, 1227 (8th Cir. 1982) (per curiam); see also Class Plaintiffs v. Jaffe and Schlesinger, P.A., 19 F.3d 1306, 1308 (9th Cir. 1994) (per curiam). In our case, the efforts of the firm in question do not appear to have changed any of the terms in the settlement agreement. We note that although the firm intimated to the district court that Amoco increased its settlement offer because of the firm's efforts in parallel cases, the district court's refusal to draw the desired inference was not an abuse of discretion. In addition, unlike in Elliott, and for the reasons provided above with respect to the need for subclasses, there was insufficient indication that the objectors or any other subgroup of class members needed separate counsel.

Under these circumstances, we do not believe that the district court abused its discretion when it found that the firm's "post-disqualification involvement has not meaningfully or materially contributed to the adversarial nature of the proceedings or to the terms of the Settlement Agreement," and denied an award of attorney fees. This finding also forecloses the prospect of the firm's recovering fees under the familiar

principles of quantum meruit. See, e.g., International Materials Corp., 824 S.W.2d at 895 ("[a]s in all cases involving quantum meruit recovery, the services must have enriched the client in the sense of benefits conferred").

## VII.

The objectors also complain that the district court erred in approving the fees awarded to the remaining class counsel. The district court evaluated the proposed fee award using the "percentage of the fund" method. The court found that the proposed fee constituted 24 percent of the monetary compensation to the class, and therefore that the fee was reasonable, particularly given that significant nonmonetary benefits are also being given to the class. We do not believe that the district court abused its discretion. It is well established in this circuit that a district court may use the "percentage of the fund" methodology to evaluate attorney fees in a common-fund settlement, see Johnston v. Comerica Mortgage Corp., 83 F.3d 241, 244-45 (8th Cir. 1996), and a fee of 24 percent of the monetary benefits in this case appears reasonable. See Court Awarded Attorneys Fees, Report of the Third Circuit Task Force, 108 F.R.D. 237, 247 n.32 (3rd Cir. 1985) (suggesting that awards in the range of 20 percent to 25 percent are reasonable).

The district court also verified the reasonableness of the fee award by calculating the fee under a "lodestar" approach -- totaling the hours worked and multiplying them by a typical hourly fee. The objectors suggest a number of flaws in the data used to calculate the award under the lodestar approach. Having found that the district court's approval of the fee under the "percentage of the fund" approach was proper, however, we need not address these criticisms. In so finding, we note that although use of the "lodestar" approach is sometimes warranted to double-check the result of the "percentage of the fund" method, we detect no indication here that the award is overly generous.

## VIII.

The objectors argue in their brief that the district court erred in refusing to allow certain objectors to intervene in the case so that they could appeal some of the district court's rulings.  As the objectors recognize in their brief, however, we need not address this issue, since neither Amoco nor the  class  counsel  contests the standing of at least one of the objectors to raise the above-stated issues.

## IX.

For the foregoing reasons we affirm the judgment of the district court in all respects.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.