## In re XCEL ENERGY, INC., SECURITIES, DERIVATIVE & "ERISA" LITIGATION

**This document relates to: All Actions**

**No. CIV.02–2677(DSD/FLN).**

United States District Court,
D. Minnesota.

April 8, 2005.

Guri Ademi, Not Admitted, for Max Bruckner, Stephen Herod, Plaintiffs.

James L Altman, Xcel Energy, Mpls, for Xcel Energy, Defendant.

Carolyn Glass Anderson, Zimmerman Reed, Mpls, for Victor J Sakal, United Brotherhood of Carpenters and Joiners of America, AFL–CIO, Movants.

George E Barrett, Barrett Johnston & Parsley, Nashville, TN, for Gene Barday, Jr., Plaintiff.

Andrew L Barroway, Schiffrin & Barroway, LLP, Radnor, PA, for Private Asset Management, Movant.

Thomas J Basting, Jr, Briggs & Morgan—Mpls, Mpls, for Xcel Energy, Edward J McIntyre, James J Howard, Wayne H Brunetti, Wayne H Brunette, A Barry Hirschfeld, A Patricia Sampson, Albert F Moreno, Allan L Schuman, C Coney Burgess, David A Christensen, David E Ripka, Douglas W Leatherdale, Gian-

nantonio Ferrari, Margaret R Preska, Rodney E Slifer, Roger R Hemminghaus, W Thomas Stephens, Defendants.

Stuart Berman, Schiffrin & Barroway, LLP, Radnor, PA, for Private Asset Management, Movant.

Garrett D Blanchfield, Jr, Reinhardt Wendorf & Blanchfield, St Paul, for Max Bruckner, Stephen Herod, Chips Investments Limited Partnership, Plaintiffs.

Jeffrey D Bores, Chestnut & Cambronne, Mpls, for Chips Investments Limited Partnership, L.A. Amundson Scholarships, Inc., Lake Benton Bancorporation, Inc., Lloyd & Barbara Amundson Charity Foundation, Beverly K Aanenson, Catholic Workman, Harry C Andrews, Steven Aanenson, Thomas R Perry, Jr, Donald Newcome, Leonard Banks, All Plaintiffs, Plaintiffs.

Carole A Broderick, Not Admitted, for Chips Investments Limited Partnership, L.A. Amundson Scholarships, Inc., Lake Benton Bancorporation, Inc., Lloyd & Barbara Amundson Charity Foundation, Beverly K Aanenson, Catholic Workman, Harry C Andrews, Steven Aanenson, Thomas R Perry, Jr, Plaintiffs.

Karl L Cambronne, Chestnut & Cambronne, Mpls, for Chips Investments Limited Partnership, L.A. Amundson Scholarships, Inc., Lake Benton Bancorporation, Inc., Lloyd & Barbara Amundson Charity Foundation, Beverly K Aanenson, Catholic Workman, Harry C Andrews, Steven Aanenson, Thomas R Perry, Jr, All Plaintiffs, Plaintiffs.

Steven E Cauley, Cauley Geller Bowman & Coates, Little Rock, AR, for Victor J Sakal, Movant.

Darren J Check, Schiffrin & Barroway, Bala Cynwyd, PA, for Private Asset Management, Movant.

Jack L Chestnut, Chestnut & Cambronne, Mpls, for Chips Investments Limited Partnership, L.A. Amundson Scholarships, Inc., Lake Benton Bancorporation, Inc., Lloyd & Barbara Amundson Charity Foundation, Beverly K Aanenson, Catholic Workman, Harry C Andrews, Steven Aanenson, Thomas R Perry, Jr, Plaintiffs.

Martin D Chitwood, Chitwood & Harley, Atlanta, GA, for Max Bruckner, Stephen Herod, Chips Investments Limited Partnership, Plaintiffs.

John A Cochrane, Cochrane & Bresnahan PA, St Paul, for Donald Newcome, Gene Barday, Jr., Leonard Banks, Plaintiffs.

Glen M Connor, Whatley Drake, Birmingham, AL, for Donald Newcome, Leonard Banks, Plaintiffs.

Harvey H Eckart, Eckart & Leonetti PA, St. Paul, for Edith Gottlieb, Movant.

Nadeem Faruqi, Not Admitted, for Max Bruckner, Stephen Herod, Plaintiffs.

Adrienne M Ferraro, Jones Day—Cleveland, Cleveland, OH, for Xcel Energy, A Barry Hirschfeld, A Patricia Sampson, Albert F Moreno, Allan L Schuman, C Coney Burgess, David A Christensen, David E Ripka, Douglas W Leatherdale, Edward J McIntyre, Giannantonio Ferrari, Margaret R Preska, Rodney E Slifer, Roger R Hemminghaus, W Thomas Stephens, Wayne H Brunetti, Defendants.

Jeffrey P Fink, Robbins Umeda & Fink LLP, San Diego, CA, for Gene Barday, Jr., Plaintiff.

Christine M Fox, Kaplan Fox & Kilsheimer, New York, NY, for Chips Investments Limited Partnership, L.A. Amundson Scholarships, Inc., Lake Benton Bancorporation, Inc., Lloyd & Barbara Amundson Charity Foundation, Beverly K Aanenson, Catholic Workman, Harry C Andrews, Steven Aanenson, Thomas R Perry, Jr, Plaintiffs.

Frederic S Fox, Kaplan Fox & Kilsheimer, New York, NY, for Chips Investments Limited Partnership, L.A. Amundson Scholarships, Inc., Lake Benton Bancorporation, Inc., Lloyd & Barbara Amundson Charity Foundation, Beverly K Aanenson, Catholic Workman, Harry C Andrews, Steven Aanenson, Thomas R Perry, Jr, Plaintiffs.

Carol V Gilden, Much Shelist Freed Denenberg Ament & Rubenstein, Chicago, IL, for Chips Investments Limited Partnership, L.A. Amundson Scholarships, Inc., Lake Benton Bancorporation, Inc., Lloyd & Barbara Amundson Charity Foundation, Beverly K Aanenson, Catholic Workman, Harry C Andrews, Steven Aanenson, Thomas R Perry, Jr, Plaintiffs.

Stephen D Gurr, Kamlet Shepherd & Reichert, LLP, Denver, CO, for James J Howard, Defendant.

Daniel E Gustafson, Gustafson Gluek PLLC, Mpls, for Chips Investments Limited Partnership, Plaintiff.

Samuel D Heins, Heins Mills & Olson, Mpls, for Chips Investments Limited Partnership, Plaintiff.

Lisa Hogan, Brownstein Hyatt & Farber, Denver, CO, for A Barry Hirschfeld, A Patricia Sampson, Albert F Moreno, Allan L Schuman, C Coney Burgess, David A Christensen, David E Ripka, Douglas W Leatherdale, Edward J McIntyre, Giannantonio Ferrari, Margaret R Preska, Rodney E Slifer, Roger R Hemminghaus, W Thomas Stephens, Wayne H Brunetti, Defendants.

Elizabeth R Imhoff, Brownstein Hyatt & Farber, Denver, CO, for A Barry Hirschfeld, A Patricia Sampson, Albert F Moreno, Allan L Schuman, C Coney Burgess, David A Christensen, David E Ripka, Douglas W Leatherdale, Edward J McIntyre, Giannantonio Ferrari, Margaret R Preska, Rodney E Slifer, Roger R Hem-

minghaus, W Thomas Stephens, Wayne H Brunetti, Defendants.

Geoffrey M Johnson, Law Firm Unknown, for Xcel Energy, Edward J McIntyre, Wayne H Brunetti, A Barry Hirschfeld, A Patricia Sampson, Albert F Moreno, Allan L Schuman, C Coney Burgess, David A Christensen, David E Ripka, Douglas W Leatherdale, Giannantonio Ferrari, James J Howard, Margaret R Preska, Rodney E Slifer, Roger R Hemminghaus, W Thomas Stephens, Defendants.

Douglas S Johnston, Jr, Barrett Johnston & Parsley, Nashville, TN, for Gene Barday, Jr., Plaintiff.

Ellen M Kelman, Bruaer Buescher Goldhammer Kelman & Dodge, Denver, CO, for Donald Newcome, Leonard Banks, Plaintiffs.

Ashley Kim, Not Admitted, for United Brotherhood of Carpenters and Joiners of America, AFL–CIO, Movant.

Michael Charles Krikava, Briggs & Morgan, Mpls, for Xcel Energy, Edward J McIntyre, James J Howard, Wayne H Brunetti, Wayne H Brunette, A Barry Hirschfeld, A Patricia Sampson, Albert F Moreno, Allan L Schuman, C Coney Burgess, David A Christensen, David E Ripka, Douglas W Leatherdale, Giannantonio Ferrari, Margaret R Preska, Rodney E Slifer, Roger R Hemminghaus, W Thomas Stephens, Defendants.

Joey P Leniski, Branstetter Kilgore Stranch & Jennings, Nashville, TN, for Donald Newcome, Plaintiff.

William S Lerach, Lerach Coughlin Stoia Geller Rudman & Robbins LLP—SD, San Diego, CA, for Max Bruckner, Stephen Herod, Plaintiffs.

Christopher Lometti, Not Admitted, for United Brotherhood of Carpenters and Joiners of America, AFL–CIO, Movant.

Andrew Luger, Greene Espel, Mpls, for Luella G Goldberg, Defendant.

Eric J Magnuson, Rider Bennett LLP, Mpls, for James J Howard, Defendant.

Timothy L Miles, Barrett Johnston & Parsley, Nashville, TN, for Gene Barday, Jr., Plaintiff.

Stacey L Mills, Heins Mills & Olson, PLC, Mpls, for Chips Investments Limited Partnership, Plaintiff.

Patrick F Morris, Morris & Morris LLC, Wilmington, DE, for Edith Gottlieb, Movant.

Bruce G Murphy, Murphy Law Offices, Vero Beach, FL, for Edith Gottlieb, Movant.

John M Newman, Jr, Jones Day—Cleveland, Cleveland, OH, for Xcel Energy, Edward J McIntyre, Wayne H Brunetti, Wayne H Brunette, A Barry Hirschfeld, A Patricia Sampson, Albert F Moreno, Allan L Schuman, C Coney Burgess, David A Christensen, David E Ripka, Douglas W Leatherdale, Giannantonio Ferrari, James J Howard, Margaret R Preska, Rodney E Slifer, Roger R Hemminghaus, W Thomas Stephens, Defendants.

William J Otteson, Greene Espel, Mpls, for Luella G Goldberg, Defendant.

Phyllis M Parker, Berger & Montague, Philadelphia, PA, for Chips Investments Limited Partnership, L.A. Amundson Scholarships, Inc., Lake Benton Bancorporation, Inc., Lloyd & Barbara Amundson Charity Foundation, Beverly K Aanenson, Catholic Workman, Harry C Andrews, Steven Aanenson, Thomas R Perry, Jr, Plaintiffs.

Randall K Pulliam, Cauley Geller Bowman & Coates, Little Rock, AR, for Victor J Sakal, Movant.

Raja Raghunath, Gilbert & Sackman, Los Angeles, CA, for Donald Newcome, Plaintiff.

Geoffrey J Ritts, Jones Day—Cleveland, Cleveland, OH, for Edward J McIntyre,

James J Howard, Wayne H Brunetti, Wayne H Brunette, Xcel Energy, A Barry Hirschfeld, A Patricia Sampson, Albert F Moreno, Allan L Schuman, C Coney Burgess, David A Christensen, David E Ripka, Douglas W Leatherdale, Giannantonio Ferrari, Margaret R Preska, Rodney E Slifer, Roger R Hemminghaus, W Thomas Stephens, Defendants.

Brian J Robbins, Robbins Umeda & Fink LLP, San Diego, CA, for Gene Barday, Jr., Plaintiff.

Darren J Robbins, Lerach Coughlin Stoia Geller Rudman & Robbins LLP—SD, San Diego, CA, for Max Bruckner, Stephen Herod, Plaintiffs.

Robert M Roseman, Spector Roseman & Kodroff, Philadelphia, PA, for Chips Investments Limited Partnership, L.A. Amundson Scholarships, Inc., Lake Benton Bancorporation, Inc., Lloyd & Barbara Amundson Charity Foundation, Beverly K Aanenson, Catholic Workman, Harry C Andrews, Steven Aanenson, Thomas R Perry, Jr, Plaintiffs.

J Gordon Rudd, Jr, Zimmerman Reed, Mpls, for Victor J Sakal, United Brotherhood of Carpenters and Joiners of America, AFL–CIO, Movants.

Samuel H Rudman, Lerach Coughlin Stoia Geller Rudman & Robbins LLP, Melville, NY, for Max Bruckner, Stephen Herod, Plaintiffs.

Joshua M Ryland, Jones Day, Cleveland, OH, for Xcel Energy, Edward J McIntyre, Wayne H Brunetti, Wayne H Brunette, Defendants.

Jay P Saltzman, Schoengold & Sporn, New York, NY, for United Brotherhood of Carpenters and Joiners of America, AFL–CIO, Movant.

Sherrie R Savett, Berger & Montague, Philadelphia, PA, for Chips Investments Limited Partnership, L.A. Amundson Scholarships, Inc., Lake Benton Bancorporation, Inc., Lloyd & Barbara Amundson Charity Foundation, Beverly K Aanenson, Catholic Workman, Harry C Andrews, Steven Aanenson, Thomas R Perry, Jr, Plaintiffs.

Stephen G Schulman, Milberg Weiss Bershad Hynes & Lerach, New York, NY, for Max Bruckner, Stephen Herod, Plaintiffs.

Steven G Schulman, Not Admitted, for Coppedge Group, The, Movant.

Edward J Sebold, Not Admitted, for Xcel Energy, Edward J McIntyre, James J Howard, Wayne H Brunetti, Wayne H Brunette, Defendants.

Peter E Seidman, Not Admitted, for Coppedge Group, The, Movant.

Thomas Victor Seifert, Head Seifert & Vander Weide, Mpls, for Edith Gottlieb, Movant.

James Edward Smith, Gilbert & Sackman, Los Angeles, CA, for Donald Newcome, Leonard Banks, Plaintiffs.

Eugene A Spector, Spector Roseman & Kodroff, Philadelphia, PA, for Catholic Workman, Plaintiff.

James G Stranch, Branstetter Kilgore Stranch & Jennings, Nashville, TN, for Donald Newcome, Leonard Banks, Plaintiffs.

Jane B Stranch, Branstetter Kilgore Stranch & Jennings, Nashville, TN, for Donald Newcome, Leonard Banks, Plaintiffs.

Joel B Strauss, Kaplan Fox & Kilsheimer, New York, NY, for Chips Investments Limited Partnership, L.A. Amundson Scholarships, Inc., Lake Benton Bancorporation, Inc., Lloyd & Barbara Amundson Charity Foundation, Beverly K Aanenson, Catholic Workman, Harry C Andrews, Steven Aanenson, Thomas R Perry, Jr, Plaintiffs.

Rachna B Sullivan, Rider Bennett LLP, Mpls, for James J Howard, Defendant.

Timothy R Thornton, Briggs & Morgan—Mpls, Mpls, for Xcel Energy, Edward J McIntyre, James J Howard, Wayne H Brunetti, Wayne H Brunette, A Barry Hirschfeld, A Patricia Sampson, Albert F Moreno, Allan L Schuman, C Coney Burgess, David A Christensen, David E Ripka, Douglas W Leatherdale, Giannantonio Ferrari, Margaret R Preska, Rodney E Slifer, Roger R Hemminghaus, W Thomas Stephens, Defendants.

Marc A Topaz, Schiffrin & Barroway, LLP, Radnor, PA, for Max Bruckner, Stephen Herod, Plaintiffs.

Erika M Van Ausdall, Law Firm Unknown 00000, for Xcel Energy, Edward J McIntyre, Wayne H Brunetti, Defendants.

Vernon Jay Vander Weide, Head Seifert & Vander Weide, Mpls, for Private Asset Management, Edith Gottlieb, Movants.

Joe R Whatley, Jr, Whatley Drake, Birmingham, AL, for Donald Newcome, Leonard Banks, Gene Barday, Jr., Plaintiffs.

Richard Gregory Wilson, Maslon Edelman Borman & Brand, Mpls, for David H Peterson, Leonard A Bluhm, Luella G Goldberg, Defendants.

Alfred G Yates, Jr, Yates Law Office, Pittsburgh, PA, for Max Bruckner, Stephen Herod, Plaintiffs.

## ORDER

DOTY, District Judge.

This matter came before the court on April 1, 2005, on several motions for final approval of class action settlements in the Securities, Derivative and ERISA Actions against defendants Xcel Energy, Inc. ("Xcel") and certain of its officers, directors, and pension plan fiduciaries and for awards of attorney fees, reimbursement of expenses, and awards to lead and representative plaintiffs. In separate orders dated April 1, 2005, the court approved the settlements as fair and reasonable and in accordance with the requirements of due process and Federal Rule of Civil Procedure 23, but it took under consideration the motions for attorney fees, reimbursement of expenses, and lead and representative plaintiff awards. Based on a review of the file, extensive record and proceedings herein, and for the reasons stated, the motions for fees, expenses and awards are granted.

## BACKGROUND

This is consolidated multi-district litigation, see *In re Xcel Energy Inc. Sec., Derivative & "ERISA" Litig.*, 254 F.Supp.2d 1368, 1369 (J.P.M.L.2003) (*Xcel Energy I*), which commenced in mid-2002 and was resolved through settlement at the end of 2004. The court observes that this is a relatively short period for resolution of complex litigation of this kind. The actions stem from a dramatic reduction in the market value of Xcel securities following the disclosure in July 2002 of adverse information about its financial ties to its subsidiary, NRG Energy, Inc. ("NRG") through cross-default provisions contained in two of Xcel's credit facilities with banks totaling $800 million, and investigations into its alleged round-trip trading of energy.

All three actions were subject to dispositive motion practice during the litigation. Because the court previously discussed the primary allegations in written decisions on those motions, the court will not repeat the underlying factual allegations here. See *In re Xcel Energy, Inc. Sec., Derivative, & "ERISA" Litig.*, 286 F.Supp.2d 1047 (D.Minn.2003) (*Xcel Energy II*); *In re Xcel Energy, Inc. Sec., Derivative & "ERISA" Litig.*, 312 F.Supp.2d 1165 (D.Minn.2004) (*Xcel Energy III*); *In re Xcel Energy, Inc. Sec., Derivative & "ERISA" Litig.*, 222 F.R.D. 603 (D.Minn. 2004) (*Xcel Energy IV*). Instead, the court will briefly discuss the litigation pro-

ceedings as relevant for its determination of attorney fees, costs and lead plaintiff awards.

## A. The Securities Action

In the Securities Action, lead plaintiffs [1] and plaintiffs' co-lead counsel, Chestnut & Cambronne, P.A., and Berger & Montague, P.C., and other plaintiffs' counsel actively litigated the matter for over two and a half years. They investigated the events and transactions underlying the securities claims both prior to filing the initial complaints and before and after filing the amended complaint. They defended the complaint against three motions to dismiss under the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78r–4, et seq. (the PSLRA), a critical motion in federal securities litigation. *See Xcel Energy II*, 286 F.Supp.2d at 1060.

Plaintiffs' co-lead counsel retained and consulted with an economic expert who performed a damages analysis. They reviewed and analyzed voluminous publicly available documents as well as several hundred thousands of pages of documents that defendants and twenty non-parties produced during discovery. Discovery also included requests for admission and written interrogatories. Although lead plaintiffs had served notices of taking depositions on defendants, the case resolved prior to depositions being taken. Lead plaintiffs also responded to defendants' written discovery requests, producing interrogatory responses and almost four thousand pages of documents. Additionally, plaintiffs' and defendants' counsel held many meetings and telephonic conferences

to coordinate various aspects of the Securities, ERISA, and Derivative Actions. Finally, plaintiffs' co-lead counsel, defense counsel, and defendants' insurance carriers engaged in a two-day mediation ordered by this court with Jonathan Marks. They also had various private talks following the mediation. In the mediation, lead plaintiffs submitted two memoranda of law and over 1,200 pages of supporting documentation. The mediation and subsequent settlement negotiations resulted in an $80 million settlement, which to the court's knowledge is the largest securities fraud settlement in this federal district and the second largest settlement in the Eighth Circuit.[2]

In their attorney fee submission, plaintiffs' counsel reported that they spent a total of 10,401.67 hours prosecuting this litigation, resulting in a collective lodestar of $4,255,949. Hourly rates for the attorneys involved in the litigation ranged from $225 to $650 per hour and paralegal time from $60 to $195 per hour. The lodestar was calculated by multiplying each attorney or paralegal hours by their hourly rate. *See Johnston v. Comerica Mortgage Corp.*, 83 F.3d 241, 244 (8th Cir.1996) (lodestar method involves multiplying hours expended by a reasonable hourly rate to produce a fee that can be adjusted to reflect the unique characteristics of a given action). Based on the requested attorney fee of 25% of the $80 million settlement, a multiplier of 4.7 results.

March 17, 2005 was the opt-out and objection deadline. The settlement administrator received thirteen timely objec-

---

**1.** In an order filed November 13, 2002, the court appointed as lead plaintiffs in the Securities Action a group of eight entities and individuals, namely Chips Investments Limited Partnership, Steven C. Aanenson, Beverly K. Aanenson, Harry C. Andrews, Thomas R. Perry, Jr., Lloyd and Barbara Amundson Charity Foundation, Lake Benton Bancorpo-

ration, Inc., and L.A. Amundson Scholarships, Inc.

**2.** *See In re BankAmerica Corp. Sec. Litig.*, 228 F.Supp.2d 1061 (E.D.Mo.2002) (approving $490 million settlement), *aff'd*, 350 F.3d 747 (8th Cir.2003).

tions, seven of which pertain to attorney fees. Those seven objections fall into two general categories: (1) the fees are excessive for a case that has been settled rather than tried and that results in a 4x multiplier (*see* Objs. of Commonwealth of Pa. Pub. Employees' Ret. Sys. & Pa. Mun. Ret. Sys., N.Y. State Teachers' Ret. Sys., & Pub. Employees Ret. Sys. of Idaho (the "Fund Objectors"), & Ron J. Park, Jr.); and (2) class actions are little more than extortion, and the class action attorneys should be punished for bringing the case that pays little to shareholders by awarding them only nominal attorney fees (*see* Objs. of Robert P. & Carol L. Sabourin, Irene M. Zieske, & Ron Aumann.). (*See* Chestnut & Savett Decl. Supp. Mot. Atty. Fees Ex. I.)[3]

### B. The ERISA Action

The ERISA Action[4] commenced in September 2002, and thus was pending for nearly as long as the Securities Action. Plaintiffs' counsel investigated the claims, events and underlying transactions, as well as the operations and administration of the plans at issue. As part of their investigation, plaintiffs' counsel interviewed participants of the plans and employees, researched Xcel and its predecessor companies, and reviewed numerous documents pertaining to the plans, their operations, underlying events, and damages. They engaged in written and document discovery. Plaintiffs' counsel retained experts in the subject matter of ERISA plan fiduciary obligations and damages. Like lead plaintiffs in the Securities Action, plaintiffs faced a motion to dismiss, which was ex-

tensively briefed and denied. *See Xcel Energy III*, 312 F.Supp.2d at 1183. Defendants' motion for partial summary judgment was pending when the parties settled the ERISA claims.[5]

The mediation and settlement negotiations in the ERISA Action likewise resulted in a settlement, which has three components. First, defendants agreed to pay $8 million plus interest. Second, certain stock restrictions would be released, which plaintiffs valued between $38 million and $94 million. The restrictions had prevented participants from reallocating employer-match contributions (which were limited exclusively to investment in Xcel common stock) to other fund options in the plans. Finally, plan participants who acquired shares during the class period in the Securities Action will recover their losses as permitted under that settlement.

Plaintiffs' counsel in their attorney fee submission indicated that they devoted a total of 2,041.75 hours to the ERISA Action. This resulted in a collective lodestar of $876,611.75. Hourly rates for the attorneys involved in the litigation ranged from $200 to $550 per hour and paralegal time from $50 to $185 per hour. Based on the requested attorney fee of 25% of the $8 million cash portion of the settlement, plaintiffs' counsel would receive a multiplier of 2.16. No class member has raised an objection to the attorney fee request in the ERISA Action.

### C. The Derivative Action

Plaintiff Edith Gottlieb commenced a shareholder derivative suit in August 2002 on behalf of Xcel against Xcel's then-board

---

**3.** Park appeared at the hearing telephonically. The six other attorney fee objectors, including the three Fund Objectors, did not have a representative attend the hearing.

**4.** Plaintiffs in the ERISA Action are Gene Barday, Jr., Donald Newcome and Leonard Banks.

**5.** During the April 1, 2005 hearing, counsel for defendants and ERISA plaintiffs agreed that the pending partial summary judgment motion was subsumed as part of the settlement.

of directors. Defendants moved to dismiss the complaint, and this court granted the motion under Rule 23.1 for failing to make a demand or stating with sufficient particularity why such a demand would have been futile. *Xcel Energy IV,* 222 F.R.D. at 608. Plaintiff appealed the dismissal to the United States Court of Appeals for the Eighth Circuit. The matter was fully briefed but not argued at the appellate court when the Derivative Action settlement negotiations began. As part of the settlement, the parties moved to remand the matter back to this court for consideration of the settlement, which the appellate court granted on December 28, 2004.

The settlement provides for corporate governance relief including direct oversight responsibility regarding operational risk management by the finance committee of Xcel's board of directors and to disclose operational risk exposures the company faces. Other changes include increasing the number of the audit committee annual meetings and requiring that an audit committee member also serve on the finance committee. In addition, the finance committee will coordinate with Xcel management and the audit committee on issues of major financial and operational risk exposure, and Xcel will increase the number of annual meetings of the governance, compliance and nominating committee to no fewer than four meetings.

In their attorney fee submission, plaintiff's counsel reported that they spent a total of 1,081.90 hours on this litigation, resulting in a total lodestar of $540,452. Hourly rates for the attorneys and paralegals involved in the litigation ranged from $250 to $585 per hour and from $70 to $95 per hour, respectively. Plaintiff's counsel

had expenses of $13,372.82. In the Derivative Action, plaintiff's counsel, plaintiffs' co-lead counsel in the Securities Action and defendants' counsel negotiated $250,000 in total for attorney fees and costs. One-half that amount would be paid out of the $80 million securities settlement. No objections have been received to the request for attorney fees in the Derivative Action. The fees requested will provide plaintiff's counsel with less than half of their lodestar, a multiplier of 0.44.

## DISCUSSION

### I. Standards for Approving Attorney Fees in a Class Action

■ An award of attorney fees is committed to the sound discretion of the district court. *Petrovic v. Amoco Oil Co.,* 200 F.3d 1140, 1157 (8th Cir.1999); *see also* Fed.R.Civ.P. 23(h). A routine calculation of fees involves the common-fund doctrine, which is based on a percentage of the common fund recovered. *See Blum v. Stenson,* 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *In re U.S. Bancorp Litig.,* 291 F.3d 1035, 1038 (8th Cir.2002) (awarding attorney fees of 36% from a $3.5 million common fund). In the Eighth Circuit, use of a percentage method of awarding attorney fees in a common-fund case is not only approved, but also "well established." *Petrovic,* 200 F.3d at 1157.

There are strong policy reasons behind the judicial and legislative preference[6] for the percentage of recovery method of determining attorney fees in these cases. *See Deposit Guar. Nat'l Bank v. Roper,* 445 U.S. 326, 338–39, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980) (noting that the common fund doctrine encourages attorneys to

---

**6.** For purposes of the attorney fee award in the Securities Action, the court notes that the PSLRA incorporates the common fund percentage method. 15 U.S.C. § 78u–4(a)(6) (providing that "[t]otal attorneys' fees and

expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class").

bring actions to redress wrongs where it might not be economically feasible to pursue damage claims individually). Under the percentage method, "[t]he more the attorney succeeds in recovering money for the client, and the fewer legal hours expended to reach that result, the higher dollar amount of fees the lawyer earns ...." *Lachance v. Harrington,* 965 F.Supp. 630, 647 (E.D.Pa.1997) (quoting 1 Alba Conte, *Attorney Fee Awards* § 1.08, at 15 (2d ed.1993)). "Thus, one of the primary advantages of the [percentage of recovery] method is that it is thought to equate the interests of class counsel with those of the class members and encourage class counsel to prosecute the case in an efficient manner." *Id.*

■ The court will exercise its discretion and use the percentage method to award fees in the Securities and ERISA Actions. But before the court begins its detailed analysis, it starts with two observations.

The first observation is a simple one and one of which litigants and their counsel in civil litigation, and especially in complex civil litigation, too often lose sight. The Federal Rules of Civil Procedure "shall be construed and administered to ensure the *just, speedy, and inexpensive determination* of every action." Fed.R.Civ.P. 1 (emphasis added); *see Perkins v. Gen. Motors Corp.,* 965 F.2d 597, 600 (8th Cir.1992) (litigants must avoid engaging in tactics that thwart the purpose of moving cases along in a just, speedy and inexpensive manner). Under Rule 1, as officers of the court, attorneys share the responsibility with the court of ensuring that cases are "resolved not only fairly, but without undue cost or delay." Fed.R.Civ.P. 1 advisory committee's notes on 1993 amendments.

All counsel-both those representing plaintiffs and defendants-conducted this litigation in an exemplary manner and fulfilled their obligations under Rule 1. This is the type of complex litigation that easily could have dragged on for several more years. Instead, it had a relatively short stay of two and a half years on this court's docket because counsel litigated the case efficiently and inexpensively. The lodestar of plaintiffs' counsel could easily have been much higher had not counsel cooperated with one another through the litigation and settlement process. Instead, all plaintiffs' counsel presented a modest lodestar because they moved the case along efficiently to a just result in a remarkably short period of time.

■ The second observation is that the percentage method imposes a fiduciary responsibility on the court when awarding attorney fees because often persons with small individual stakes will not file objections and the defendant who created the fund has little interest in how the fund is allocated between the class and class counsel. *In re BankAmerica Corp. Sec. Litig.,* 228 F.Supp.2d 1061, 1064 (E.D.Mo.2002) (citing *Rawlings v. Prudential–Bache Props., Inc.,* 9 F.3d 513, 516 (6th Cir. 1993)), *aff'd,* 350 F.3d 747, 751 (8th Cir. 2003). The court takes this responsibility seriously.

The Eighth Circuit has not established factors that a district court should consider when calculating the reasonable percentage to award attorney fees in a common fund case, *see U.S. Bancorp,* 291 F.3d at 1038, although it has under the alternative lodestar method, *see Grunin v. International House of Pancakes,* 513 F.2d 114, 127 (8th Cir.1975) (four factors to consider are the number of hours of work, the reasonable hourly rate, the contingent nature of success and the quality of the attorney's work).[7] Prior Eighth Circuit

7. The Eighth Circuit also has not established a "benchmark" percentage that the court

cases, however, have turned to the twelve-factor test from *Johnson v. Georgia Highway Express,* 488 F.2d 714, 719–20 (5th Cir.1974), many of which are similar to the ones in *Grunin.* *See Harris v. Union Electric Co.,* No. 80–0196C, 1985 WL 5817, at *2 (E.D.Mo. Sept.30, 1985) (applying *Johnson* factors to award reasonable attorney fees out of a settlement fund in a § 10b–5 case); *cf. Easley v. Anheuser-Busch, Inc.,* 758 F.2d 251, 265 (8th Cir. 1985) (applying *Johnson* to non-class employment discrimination claim); *Nyman v. Investors Diversified Servs., Inc.,* No. Civ. 4–75–22, 1981 WL 1705, at *1 (D.Minn. Oct.27, 1981) (citing *Johnson* factors in analyzing reasonableness of attorney fees in a shareholder derivative case under Fed.R.Civ.P. 23.1). The *Johnson* factors are:

> (1) The time and labor required; (2) The novelty and difficulty of the questions; (3) The skill requisite to perform the legal service properly; (4) The preclusion of other employment by the attorney due to acceptance of the case; (5) The customary fee for similar work in the community; (6) Whether the fee is fixed or contingent; (7) Time limitations imposed by the client or the circumstances; (8) The amount involved and the results obtained; (9) The experience, reputation, and ability of the attorneys; (10) The undesirability of the case; (11) The nature and length of the professional relationship with the client; and (12) Awards in similar cases.

*Johnson,* 488 F.2d at 719–20 (internal quotations omitted).

Plainly, not all of the individual *Johnson* factors will apply in every case, so the court has wide discretion as to which factors to apply and the relative weight to assign to each. *See e.g., Uselton v. Commercial Lovelace Motor Freight, Inc.,* 9 F.3d 849, 854 (10th Cir.1993) ("[R]arely are all of the *Johnson* factors applicable; this is particularly so in a common fund situation." (citation omitted)); *In re Catfish Antitrust Litig.,* 939 F.Supp. 493, 502 (N.D.Miss.1996) ("Even though the *Johnson* factors must be addressed to ensure that the resulting fee is reasonable, not every factor need be necessarily considered.").

█ In awarding the attorney fees in this case, the court will exercise its discretion by analyzing a number of factors and considerations to ensure that the attorney fees are reasonable based upon the individualized and unique circumstances of these actions. The court will consider the (1) the benefit conferred on the class, (2) the risk to which plaintiffs' counsel were exposed, (3) the difficulty and novelty of the legal and factual issues in the case, including whether plaintiffs were assisted by a relevant governmental investigation, (4) the skill of the lawyers, both plaintiffs and defendants, (5) the time and labor involved, including the efficiency in handling the case, (6) the reaction of the class and (7) the comparison between the requested attorney fee percentage and percentages awarded in similar cases. After the court determines the reasonable percentage, it will cross-check the reasonableness of the attorney fees by comparing the percentage award to the lodestar.

## II. The Securities Action

█ Plaintiffs' counsel in the Securities Action request that the court award 25%

---

should presume to be reasonable in a common fund case, subject to upward or downward deviations depending on the specific circumstances of the case, as other circuits have. *See, e.g., In re Sunbeam Sec. Litig.,* 176 F.Supp.2d, 1323, 1335 (S.D.Fla.2001) (noting the size of the settlement did not warrant an upward or downward departure from the "benchmark" of 25%).

of the $80 million settlement plus interest. They also request reimbursement of $481,422.94 for expenses and a collective award of $100,000 to lead plaintiffs.

### A. The Benefit Conferred to the Class

The benefit conferred to the class and the result achieved is accorded particular weight here. *See, e.g., In re Terra–Drill P'ships Sec. Litig.,* 733 F.Supp. 1127, 1129 (S.D.Tex.1990) (noting that the *Johnson* factors emphasize "the results obtained"). Plaintiffs' counsel achieved a substantial settlement of $80 million, which, as explained above, to the court's knowledge is the largest securities fraud class action settlement in the District of Minnesota and the second largest in the Eighth Circuit.

Although the court will discuss the risks in the next factor, suffice it to say here that plaintiffs' co-lead counsel achieved this result in the face of considerable risks. They obtained a just result without the assistance of a governmental investigation of securities fraud.[8] This further justifies awarding 25% of the settlement funds based on the extraordinary results achieved. *See In re Sunbeam Sec. Litig.,* 176 F.Supp.2d 1323, 1336 (S.D.Fla.2001) (citing *Ressler v. Jacobson,* 149 F.R.D. 651, 654 (M.D.Fla.1992), which awarded 30% as attorney fees based on the significant fact that counsel achieved an excellent result "without the benefit of any active assistance from any governmental agency"); *In re RJR Nabisco Sec. Litig.,* MDL No. 818(MBM), 1992 WL 210138, at *8 (S.D.N.Y. Aug.24, 1992) (awarding 25% fee and noting that plaintiffs' counsel, not a governmental agency, exclusively developed the facts in aid of the plaintiffs' case).

### B. The Risks Involved

■ The risks plaintiffs' counsel faced must be assessed as they existed in the morning of the action, not in light of the settlement ultimately achieved at the end of the day. *See, e.g., Harman v. Lyphomed, Inc.,* 945 F.2d 969, 974 (7th Cir. 1991) (attorney fee award "reflects a worthwhile *ex ante* arrangement for counsel"); *In re Prudential Sec. Ltd. P'ships Litig.,* 912 F.Supp. 97, 100 (S.D.N.Y.1996) (considering "the consequent risk of non-payment viewed as of the time of filing the suit"). Courts have recognized that the risk of receiving little or no recovery is a major factor in awarding attorney fees. *See, e.g., In re Prudential–Bache Energy Income P'ships,* No. 888, 1994 WL 202394, at *6 (E.D.La. May 18, 1994) (risk is an important factor in determining the fee award because both trial and judicial review are unpredictable and positive results are never guaranteed).

The risk of no recovery in complex cases of this sort is not merely hypothetical. Precedent is replete with situations in which attorneys representing a class have devoted substantial resources in terms of time and advanced costs yet have lost the case despite their advocacy. *See, e.g., Glover v. Standard Fed. Bank,* 283 F.3d 953 (8th Cir.2002) (reversing class certification); *In re Milk Prods. Antitrust Litig.,* 195 F.3d 430, 437–38 (8th Cir.1999) (affirming dismissal of complaint without leave to replead).

---

8. The Minnesota Public Utilities Company ("MPUC") held some hearings after the class period about Xcel's ties to NRG and the cross-default provisions. The Securities Exchange Commission ("SEC") and the Commodities Futures Trading Commission had issued subpoenas about the allegations of round-trip trading. *Xcel Energy II,* 286 F.Supp.2d at

1054. These investigations, however, did not aid lead plaintiffs or their counsel in prosecuting the Securities Action. For example, their damages expert opined that they could not attribute damages to the round-trip trading allegations as the market barely responded to the disclosure of the investigation.

After surviving defendants' motion to dismiss, *see Xcel Energy II,* 286 F.Supp.2d at 1054–60, lead plaintiffs continued to face many hurdles to bring about a successful result in this case. Lead plaintiffs' securities fraud claims involved the failure to disclose the cross-default provisions in Xcel's credit facilities and round-trip energy transactions. The court has already noted that this case did not benefit from meaningful governmental investigations. The court further notes that it also did not involve accounting fraud, a restatement of financials, or any allegations whatsoever of insider trading.

Lead plaintiffs also faced formidable obstacles from defendants themselves, who argued that (1) the Class–Period public statements were not materially false and misleading despite the alleged omissions because Defendants fully disclosed the nature of the Xcel–NRG relationship and Xcel's support of NRG, (2) Xcel was not required to disclose the cross-default provisions because they were not material, (3) even if the provisions were material, the cross-default provisions were in no immediate danger of becoming operative until late June 2002, (4) because of the late date at which the provisions may have been material, the class period was for a limited period of time and involved nominal damages and (5) lead plaintiffs could not prove fraudulent intent—scienter—because no evidence existed that defendants intentionally withheld information about the cross-default provisions from the investing public or that defendants had a personal motive to commit fraud. *See In re Aetna Sec. Litig.,* No. MDL 1219, 2001 WL 20928, at *14 (E.D.Pa. Jan.4, 2001) (awarding $81 million in fees, 30% of the settlement, in a three-year-old case that had disputed issues of scienter, causation, and damages). These defenses, if successful, would have drastically reduced or completely eliminated the Class' ability to obtain any recovery in this case.

In conclusion, the court determines that the risk factor, achieving an $80 million settlement against all these complex factual and legal challenges, supports the reasonableness of the 25% attorney fee award.

## C. The Difficulty and Novelty of the Legal and Factual Issues

Although plaintiffs survived the PSLRA motion to dismiss, the case still presented many difficult and novel legal questions that would have been tested in dispositive motion practice or at trial. For example, virtually no precedent exists to establish that the alleged failure to disclose the cross-default provisions constituted securities fraud. As such, it presented an issue of first impression. The case was also made more difficult because it had none of the usual indicia of securities fraud, such as accounting improprieties, a restatement of financials, any insider trading, or an investigation by the SEC into the primary allegations of securities fraud this case.

## D. The Skill of Counsel

Plaintiffs' co-lead counsel have significant experience in representing shareholders and shareholder classes in federal securities actions around the country and in this district in particular. Counsel—both the lawyers representing lead plaintiffs and defendants—conducted themselves in an exemplary manner. *See In re King Res. Co. Sec. Litig.,* 420 F.Supp. 610, 634 (D.Colo.1976) (considering the reputations of defense counsel in determining the fee as their stature reflects the challenge faced by the plaintiffs' attorneys). Defendants' attorneys (Jones Day; Briggs and Morgan, P.A.; and Rider Bennett, LLP) consistently put plaintiffs' counsel through the paces. All counsel consistently demonstrated considerable skill and cooperation to bring this matter to an amicable conclusion. Thus, the effort of counsel in effi-

ciently bringing this case to fair, reasonable and adequate resolution is the best indicator of the experience and ability of the attorneys involved, and this factor supports the court's award of 25%.

### E. The Time and Labor Involved

Over two and a half years, plaintiffs' counsel expended 10,401.67 hours to litigate and resolve this case. As the court discussed earlier in relation to Rule 1, plaintiffs' counsel presented a reasonable lodestar in a case that was not yet ancient, but easily could have become so. But for the cooperation and efficiency of counsel, the lodestar of plaintiffs' counsel would have been substantially more and would have required this court to devote significant judicial resources to its management of the case. Instead, counsel moved the case along expeditiously, and the court determines that the time and labor spent to be reasonable and fully supportive of the 25% attorney fee.

### F. The Reaction of the Class

■ Pursuant to the court's preliminary order granting approval, the settlement administrator mailed notices to more than 265,000 potential class members. The notice specifically advised them that plaintiffs' counsel would apply to this court for an attorney fee award of 25% of the settlement plus expenses and that members of the class could object to the requested fee. The court considers both the number and quality of objections when determining how a class has reacted to an attorney fee request. *See, e.g., In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 179 (E.D.Pa.2000) (six objectors were an "extremely limited" number); *Ressler*, 149 F.R.D. at 656 (the lack of objections is "strong evidence of the propriety and ac-

ceptability" of fee request); *In re Smith-Kline Beckman Corp. Sec. Litig.*, 751 F.Supp. 525, 533 (E.D.Pa.1990) (considering the absence of serious objection to counsel's fee request). Here, of the over 265,000 notices sent, only seven of the thirteen objections received concern the attorney fee award. The court will now specifically address the objections.

The seven objectors question the attorney fees that result from a 25% award.[9] The general grounds for these objections are that (1) the fees are excessive for a case that has been settled rather than be subjected to summary judgment or trial and that results in a 4x multiplier (*see* Objs. of the Fund Objectors and Ron J. Park, Jr.); and (2) class actions have little purpose and attorneys should not be rewarded for bringing such cases (*see* Objs. of Robert P. and Carol L. Sabourin, Irene M. Zieske, and Ron Aumann). (Chestnut & Savett Decl. Supp. Mot. Atty. Fees Ex. I.) The court overrules all objections.

The court notes first that the Fund Objectors unquestionably support the adequacy of the $80 million settlement and the quality of the legal services provided by plaintiffs' co-lead counsel. Nevertheless, they and Park believe the requested attorney fee award is not reasonable because it would be too high. Although the Fund Objectors point this court to cases that awarded percentages less than twenty-five and that resulted in multipliers of less than 4.7, the Pennsylvania Fund acknowledges the courts' trend to "approve attorneys' fees in the neighborhood of 25% with lodestar multiples in excess of four." (*Id.*, Pa. Obj. at 2.)

What the court gleans from this authority is that courts award percentages below and above 25% and below and above the 3x

---

9. No lead plaintiff in the Securities Action objects to the attorney fee percentage requested. The largest shareholder in the lead plain-

tiff group specifically approved the fee requested. (*See* Aanenson Decl. Supp. Mot. Atty. Fees.)

multiplier the Fund Objectors propose. This merely reflects the considerable discretion the court has in awarding attorney fees based on the uniqueness of the cases at hand.

For example, the Fund Objectors cite *In re BankAmerica,* 228 F.Supp.2d 1061 (*BankAmerica I* ), which awarded 18% of a $460 million settlement. However, several differences exist between *BankAmerica* and this case that impact each case's respective risks. First, unlike *Xcel Energy, BankAmerica* involved a proxy fraud claim under Section 14(a) of the Exchange Act and a prospectus fraud claim under Section 11 of the Securities Act, neither of which require a showing of fraud or scienter. *See In re BankAmerica Corp. Sec. Litig.,* 78 F.Supp.2d 976, 989–91 (E.D.Mo. 1999). Second, although *BankAmerica* involved a section 10b–5 claim, there the defendants in a post-class article in the *Wall Street Journal* revealed that they knew during the class period of the undisclosed material information but affirmatively chose not to divulge it. *Id.* at 997, 999. Third, as a practical matter, although the *BankAmerica* court declined to award a 25% amount, it still awarded 18%, which resulted in an attorney fee in excess of $88 million, over four times the dollar amount that plaintiffs' counsel seek in this case. *See BankAmerica I,* 228 F.Supp.2d at 1065–66.

To the extent that the Fund Objectors imply that the courts "traditionally accounted for economies of scale by awarding lower fees as the size of the fund increases" or set a multiplier cap (Chestnut & Savett Decl. Ex. I, Pa. Obj. at 2), the court reads the precedent otherwise. *See, e.g., In re Rite Aid Corp. Sec. Litig.,* 396 F.3d 294, 303, 307 (3d Cir.2005) (*Rite Aid I* ) ("[T]here is no rule that a district court must apply a declining percentage reduction in every settlement involving a sizable fund" and multipliers "need not fall within any pre-defined range, provided the district court justifies the award.").

■■ The court also rejects the Fund Objectors' argument that an award of 25% would thwart the legislative purposes of the PSLRA. "[U]nder the [PSLRA], the aim of the fee award analysis 'is not to assess whether the fee request is reasonable,' but 'to determine whether the presumption of reasonableness has been rebutted.' " *Id.* at 301 n. 10. The court finds, based on the risks involved and results reached in similar cases, that the Fund Objectors have not rebutted the presumption of reasonableness.

■ The court also overrules Park's objection. Park asks the court to use a lodestar "measuring stick." But this method is not the approved and "well established [method] in this circuit." *Petrovic,* 200 F.3d at 1157. His objection seeks to limit the attorney fees to an hourly rate commensurate with rates in fee-shifting cases or what defendants paid their counsel here, and he proposes that the attorney fee should not come out of the common fund settlement because it diminishes his recovery. However, Eighth Circuit common fund precedent governs this matter, and the rates defendants paid their counsel are not contingent and thus cannot be compared. To the extent Park is concerned that plaintiffs' counsel did not submit sufficient billing information, the court has reviewed the extensive affidavits submitted by each firm that not only set out the specific services rendered on behalf of the class, but the hours and rates of each professional who provided the services.

The court also overrules the three objections in the second category, which fall into the realm of complaints that (1) "all class actions are ludicrous, make a mockery of the judicial system, and only the overzealous attorneys make out" or (2) the case has little merit and attorneys should not

be compensated when "all they have proved is that Litigation is costly and time consuming." (Chestnut & Savett Decl. Ex. I.) The court, however, determines that this class action and the counsel who litigated it provided substantial benefits to the class and brought about a just, speedy, and efficient resolution of this case. *See* Fed.R.Civ.P. 1.

Upon careful consideration of merits of the seven objections and the minuscule number of total objections received in light of the size of the class, the court concludes that the reaction of the class supports an award of 25% of the settlement fund as attorney fees.

### G. The Comparison to Similar Cases

The court determines that the 25% award here comports with awards in similar cases. The court has looked to cases from this district, other districts, and to attorney fee studies referenced in other cases. First, courts in this circuit and this district have frequently awarded attorney fees between twenty-five and thirty-six percent of a common fund in other class actions. *See, e.g., U.S. Bancorp,* 291 F.3d at 1038 (awarding 36% of $3.5 million settlement fund); *In re Select Comfort Corp. Sec. Litig.,* No. 99–884 (D.Minn. Feb.28, 2003) (awarding 33.3% of the $5,750,000 settlement); *In re Monosodium Glutamate Antitrust Litig.,* 2003 WL 297276, at *3 (D.Minn. Feb.6, 2003) (awarding 30% in attorney fees from a $81.4 million settlement); *Cooper v. Miller Johnson Steichen Kinnard, Inc.,* No. 02–CV–1236 (D.Minn. July 22, 2003) (awarding 25% of a $5.65 million settlement); *In re E.W. Blanch Holdings, Inc. Sec. Litig.,* No. 01–258 (D. Minn. June 16, 2003) (awarding 33.3% of a $20 million settlement); *KK Motors v. Brunswick Corp.,* No. 98–2307 (D.Minn. March 6, 2000) (awarding 33.3% of $30 million settlement fund); *In re Airline Ticket Commission Antitrust Litig.,* 953 F.Supp. 280, 285–86 (D.Minn.1997) (award-ing 33.3% of $86 million fund); *In re SciMed Life Sec. Litig.,* No. 3–91–0575 (D.Minn. July 17, 1995) (awarding 33.3% of $5 million fund plus costs); *In re Control Data Sec. Litig.,* No. 3–85–1341 (D.Minn. Sept. 23, 1994) (awarding 36.96% of $8 million fund); *In re Employee Benefit Plans Sec. Litig.,* 1993 WL 330595 (D.Minn. June 2, 1993) (awarding 33.3% of the $4.2 million cash payment and 33.3% of the $6.5 million debentures to be issued); *Harris v. Republic Airlines, Inc.,* 1991 WL 238992, at *2 (D.Minn. Nov.12, 1991) (awarding "a sum slightly in excess of 30% of the common fund").

Second, this award comports with attorney fee awards in other securities actions from other federal courts around the country. *See, e.g., In re Rite Aid Corp. Sec. Litig.,* 362 F.Supp.2d 587, 588–590 (E.D.Pa. 2005) (*Rite Aid II* ) (awarding as attorney fees 25% of a $126,641,315 settlement, resulting in a multiplier of 6.96), *on remand from* 396 F.3d 294 (3d Cir.2005) (*Rite Aid I* ); *In re Sunbeam,* 176 F.Supp.2d at 1335 (awarding 25% of $110 million settlement and noting the size of the settlement did not warrant an upward or downward departure from the "benchmark" of 25%); *Ikon Office Solutions,* 194 F.R.D. at 194–95 (awarding 30% of an $111 million settlement).

Third, in addition to these specific cases, the court will borrow from an analysis submitted in the *Rite Aid* case by Professor John C. Coffee of Columbia University, which was cited with approval in *Rite Aid I,* 396 F.3d at 298. Professor Coffee considered statistical data from other securities fraud class actions and found: (1) a 31% average recovery in securities class actions involving settlements over $10 million; (2) a 27–30% median range over the course of a two-year period in selected federal district courts; and (3) 25–30% recoveries were "fairly standard" in "mega

fund" class actions involving settlements between $100 and $200 million. *See id.* at 298. Professor Coffee's reference to a median percentage of 27%–30% was based on a study by the Federal Judicial Center. *Id.* at 303. The requested fee of 25% percent actually falls below the range of attorney fee percentages in cases analyzed by Professor Coffee. Thus, this factor—comparison to other cases—supports the 25% requested in this case.

## H. Lodestar Crosscheck

 Although not required, the court will exercise its discretion and verify the reasonableness of the 25% attorney fee award by cross-checking it against lodestar. *See Petrovic,* 200 F.3d at 1157 (lodestar approach is "sometimes warranted to double check the result of the 'percentage of the fund' method"). The lodestar crosscheck need entail neither mathematical precision nor bean counting but instead is determined by considering the unique circumstances of each case. *Rite Aid I,* 396 F.3d at 303, 306. The resulting multiplier need not fall within any pre-defined range, so long as the court's analysis justifies the award, such as when the multiplier is in line with multipliers used in other cases. *Id.* at 307 n. 17. As stated before, the lodestar cross-check does not trump the court's primary reliance on the percentage of common fund method. *Rite Aid I,* 396 F.3d at 307; *Petrovic,* 200 F.3d at 1157.

Based on the collective lodestar of plaintiffs' counsel, a multiplier of 4.7 results from awarding 25% of the $80 million settlement fund as attorney fees. Courts in other securities class actions have approved attorney fees based on the percentage method that resulted in lodestar multipliers in excess of four. *See, e.g., In re Aremissoft Corp. Sec. Litig.,* 210 F.R.D. 109, 134–35 (D.N.J.2002) (awarding 28% of a $194 million settlement that resulted in a lodestar multiplier of 4.3); *In re Cendant Corp. Prides Litig.,* 51 F.Supp.2d 537

(D.N.J.1999), *vacated and remanded,* 243 F.3d 722 (3d Cir.2001), *on remand,* No. 98–2819 (D.N.J. June 11, 2002) (approving percentage fee that resulted in a multiplier of 5.28); *Maley v. Del Global Techs. Corp.,* 186 F.Supp.2d 358, 371 (S.D.N.Y.2002) (percentage fee resulted in a "modest multiplier of 4.65"); *Di Giacomo v. Plains All Am. Pipeline,* 2001 WL 34633373, at *10–11 (S.D.Fla. Dec.19, 2001) (approving percentage fee that resulted in multiplier of 5.3). Despite this precedent, the court must exercise its own independent discretion to determine whether the multiplier cross-checked here results in an attorney fee that is unreasonably large and therefore should be adjusted downward. The court determines that the result is reasonable taking into account the uniqueness of this case. Plaintiffs' counsel achieved an $80 million settlement in a securities fraud case that involved an untested legal theory of disclosing credit agreement terms, the lack of any fruits from a meaningful governmental investigation, and not any allegation of accounting fraud, restatement of financials, or insider trading. Under these circumstances, the court concludes that the 25% attorney fee, when cross-checked against a lodestar multiplier of 4.7, is reasonable. *See Rite Aid II,* 362 F.Supp.2d at 589, 2005 WL 697461, at *2 (noting 25% attorney fee from a $126 million settlement, resulting in a lodestar of 6.96 was reasonable in a rare case that involved the largest class recovery against an auditor and did not involve any official investigation).

## I. Reimbursement of Expenses

██ Plaintiffs' counsel also request reimbursement of $481,422.94 for the expenses that they advanced to prosecute this case, which the court now grants. The court is satisfied from its review of the declarations from plaintiffs' counsel that each of the expense categories for which

reimbursement is sought is non-duplicative and appropriate for payment from a class settlement fund, including expenses of photocopying, postage, messenger services, document depository, telephone and facsimile charges, filing and witness fees, computer-assisted legal research, expert fees and consultants, and meal, hotel, and transportation charges for out-of-town travel. *See In re Safety Components, Inc. Sec. Litig.,* 166 F.Supp.2d 72, 108 (D.N.J. 2001) (noting similar cost categories).

## J. Lead Plaintiff Award

The PSLRA permits the court to order an award to lead plaintiffs for the services they rendered in a securities class action. *See* 15 U.S.C. § 78u–4(a)(4) ("Nothing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of the class."). In granting compensatory awards to the representative plaintiff in PSLRA class actions, courts consider the circumstances, including the personal risks incurred by the plaintiff in becoming a lead plaintiff, the time and effort expended by that plaintiff in prosecuting the litigation, any other burdens sustained by that plaintiff in lending himself or herself to prosecuting the claim, and the ultimate recovery. *Denney v. Jenkens & Gilchrist,* 2005 WL 388562, at *31 (S.D.N.Y. Feb.18, 2005). Furthermore, courts consider not only the efforts of the representative plaintiffs in pursuing claims, but also the important policy role they play in the enforcement of the federal securities laws on behalf of persons other than themselves. *See In re Dun & Bradstreet Credit Servs. Customer Litig.,* 130 F.R.D. 366, 374 (S.D.Ohio 1990) (awarding two class representatives $55,000 each and three class representatives $35,000 each). Such enforcement is vital because if there were no individual shareholders willing to step forward and pursue a claim on behalf of other investors, many violations of law might go unprosecuted.

Lead plaintiffs here have fully discharged their PSLRA obligations and have been actively involved throughout the litigation. These individuals communicated with counsel throughout the litigation, reviewed counsels' submissions, indicated a willingness to appear at trial, and were kept informed of the settlement negotiations, all to effectuate the policies underlying the federal securities laws. The court, therefore, awards the $100,000 collectively to the lead plaintiff group to be distributed among the eight lead plaintiffs in a manner that plaintiffs' co-lead counsel shall determine in their discretion.

## III. The ERISA Action

Plaintiffs' counsel in the ERISA Action request an attorney fee award of 25% of the $8 million settlement, reimbursement of expenses totaling $66,780.30, and $2,000 to each of the three representative plaintiffs. Based on the factors set out above, the court grants their request in the exercise of its discretion using the percentage method to award attorney fees, which it notes is common in litigation of this sort. *See, e.g., Staton v. Boeing Co.,* 327 F.3d 938, 968–69 (9th Cir.2003) ("Application of the common fund doctrine to class action settlement does not compromise the purposes underlying fee-shifting statutes."); *Florin v. Nationsbank of Ga., N.A.,* 34 F.3d 560, 563 (7th Cir.1994) ("[T]he terms of ERISA's fee-shifting provision do not purport to control fee awards in cases settled with the creation of a common fund."); *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.,* 886 F.Supp. 445, 456 (E.D.Pa.1995) (common fund awards further ERISA's underlying policies).

## A. The Benefit Conferred to the Class

Plaintiffs' counsel achieved a considerable result for the ERISA class. In addition to the $8 million cash payment to a common fund, members of the ERISA class will retain their rights to make claims as permitted in the Securities Action and the restrictions on match contributions are removed. The value of this latter form of relief plaintiffs estimate to be between $38 and $94 million, resulting in a substantial "nonmonetary benefit," from which plaintiffs' counsel do not seek a percentage but which the court considers as a benefit to be taken into account in awarding attorney fees. *See Ikon Office Solutions,* 209 F.R.D. at 98–99 (approving settlement and attorney fees in an ERISA case where the primary relief obtained was removing reallocation of match contribution restrictions, with no cash payment to the class). Moreover, as with the settlement in the Securities Action, continued litigation, which could have extended several years, would have delayed recovery by the class. Instead, the settlement immediately confers benefits.

## B. The Risks Involved

As with all forms of complex litigation, plaintiffs faced many challenges. Although plaintiffs survived defendants' motion to dismiss, they were facing a partial summary judgment motion at the time of settlement. As in the Securities Action, defendants in the ERISA Action denied liability and damages and challenged plaintiffs' standing. As plaintiffs' counsel point out, this area of ERISA law is in its developmental stages. Virtually no precedent exists testing whether long-established ERISA and trust principles apply to 401(k) plans, although the *Enron* and *Qwest Communications* cases are moving through the federal court system at this time. *See In re Enron Corp. ERISA Litig.,* 284 F.Supp.2d 511 (S.D.Tex. 2003); *In re Qwest Communications ERISA Litig.,* Civ. Action No. 02–RB–464 (CSB) (D.Colo.). Some ERISA claims of this sort have met with no success. *See In re Schering–Plough Erisa Litig.,* 2004 WL 1774760, at *5 (D.N.J. June 28, 2004) (dismissing fiduciary duty claims because such recovery is for individual participants and not the plan itself). In short, plaintiffs faced many risks with no guarantee of success.

## C. The Difficulty and Novelty of the Legal and Factual Issues

In *Xcel Energy III,* this court noted that breach of duty of disclosure under ERISA is "an area of developing and controversial law." *Xcel Energy III,* 312 F.Supp.2d at 1176 (citing *In re Enron,* 284 F.Supp.2d at 555). Plaintiffs' ERISA claims faced not only difficult questions of the loyalty of plan fiduciaries who are also officers and directors of the Xcel, but also the interplay between ERISA and federal securities laws. Defendants' motion for partial summary judgment, which questioned the standing of the representative plaintiffs, also raised legal and factual questions about the ERISA claims. Had this case continued, many difficult legal and factual issues would have remained. This factor, therefore, supports the 25% award.

## D. The Skill of Counsel

The attorneys representing plaintiffs are experienced ERISA counsel and represent other plaintiffs in many other ERISA breaches of fiduciary duty lawsuits around the nation. Here, they faced the same defense attorneys as lead plaintiffs did in the Securities Action. Like that action, defense counsel mounted formidable defenses and tested plaintiffs' ERISA theories and the standing of the plaintiffs in dismissal and summary judgment motions. Plaintiffs' counsel demonstrated their

knowledge, skill and efficiency and presented the court with a notable settlement. Had it not been for the skill of counsel, there may have no recovery for the class whatsoever. Thus, this factor suggests that the award of 25% is just and reasonable.

### E. The Time and Labor Involved

Plaintiffs' counsel expended 2,041.75 hours litigating this matter for over two and a half years of litigation, which resulted in a lodestar of $876.611,75. They committed substantial resources to prosecute the ERISA Action. For example, they engaged in motion practice involving dismissal and summary judgment motions, reviewed documents and other forms of discovery, retained experts on fiduciary law and damages, and negotiated a favorable settlement. Like plaintiffs' co-lead counsel in the Securities Action, plaintiffs' counsel here moved this litigation along efficiently to a just, speedy, and inexpensive resolution.

### F. The Reaction of the Class

No member of the ERISA class objected to the terms of the settlement or the request for attorney fees. The notice advised class members that counsel would seek up to a third of the cash settlement as attorney fees, although they eventually moved for a lesser percentage. This silence can be read as an endorsement of the results received and the services rendered by plaintiffs' counsel.

### G. The Comparison to Similar Cases

To the court's knowledge, no District of Minnesota case has awarded attorney fees in an ERISA case of this nature. However, the 25% request compares to the securities and antitrust cases in which courts in this district and the Eighth Circuit have awarded percentages in this range, if not higher. From the limited authority plaintiffs' counsel cited in this area, the court is satisfied that its discretionary award of 25% comports with similar cases from other courts. *See, e.g., Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1047 (9th Cir.2002) (awarding 28% of a $97 million settlement in an action challenging freelancers ability to access employer's employee stock purchase plan); *Berger v. Xerox Corp. Ret. Income Guar. Plan,* 2004 WL 287902, at *2 (S.D.Ill. Jan.22, 2004) (awarding 29% attorney fee); *Kolar v. Rite Aid Corp.,* No. Civ. A. 01–1229, 2003 WL 1257272 (E.D.Pa. Mar.11, 2003) (awarding over $5 million in attorney fees from an ERISA settlement valued at $67.76 million, of which only $10,760,000 was cash, in a case challenging as imprudent investment in company stock); *Millsap v. McDonnell Douglas Corp.,* 2003 WL 21277124, at *13 (N.D.Okla. May 28, 2003) (awarding 25% of a $36 million settlement in an ERISA § 510 case for additional unaccrued benefits to employees vested in a pension plan).

Based upon these seven factors, the court awards as reasonable 25% of the $8 million cash-portion of the ERISA settlement.

### H. Lodestar Cross-check, Expenses and Incentive Award

In the exercise of its discretion, the court also determines that the 25% award is reasonable when cross-checked against lodestar. Here, the attorney fee of plaintiffs' counsel will result in a multiplier of 2.16. For the reasons stated above in approving the attorney fee in the Securities Action, when cross-checked against a multiplier of 4.7, the court likewise finds that the cross-check requires no deviation from the percentage awarded. *See Kolar,* 2003 WL 1257272, at *5 (approving 25% attorney fee that resulted in a 4.5 multiplier).

In conclusion, the court awards plaintiffs' counsel in the ERISA action

25% of the $8 million settlement as their attorney fees, and it determines that their request for reimbursement of costs to be reasonable. Finally, the three plaintiffs reviewed pleadings, conferred with counsel, provided information about the plan, responded to discovery, and reviewed and consented to the settlement. The court, therefore, awards $2,000 each to the three representative plaintiffs for their time and effort in pursuing this litigation. *See id.* at *6 (approving $3,750 incentive award to plaintiff); *see also Berger*, 2004 WL 287902, at *3 (approving $20,000 incentive fees to each named plaintiff).

## IV. The Derivative Action

Under both Minnesota and federal law, the purpose of a derivative action is "to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of the 'faithless directors and managers.'" *Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90, 95, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) (quoting *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 548, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)). Litigation of this nature is notoriously difficult. *See Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir.1983) ("Settlements of shareholder derivative actions are particularly favored because such litigation 'is notoriously difficult and unpredictable.'" (citation omitted)). After this court dismissed this case, counsel negotiated a settlement while it was pending at the Eighth Circuit. When settlement was reached, which involved changes to Xcel's corporate governance, plaintiff's counsel reached an arms'-length agreement that they would receive a combined fee and expense amount of $250,000. Because the attorney fee is not based on a percentage from a common fund, the court's attorney fee analysis is based on an older case from this district, *Nyman v. Investors Diversified Servs., Inc.*, 1981

WL 1705 (D.Minn. Oct.27, 1981), which specifically awarded fees in a case under Fed.R.Civ.P. 23.1. That case cited the twelve-factor test from *Johnson. Id.* at *1. Like the reasonableness analysis above, the court notes that not all of the *Johnson* factors apply. However, based on the ones that do, the court now approves $250,000 for attorney fees and costs as fair and reasonable.

### A. The Benefit Conferred to the Class

Despite the relief in this case being non-monetary, plaintiff's counsel negotiated what can be coined "therapeutic relief" for the class. The benefits conferred go to the very nature of the corporate governance that plaintiff challenged as deficient. The settlement provides corporate governance changes that affect the duties and responsibilities of the audit, finance, and corporate governance committees of the board as it relates to operational risk. The changes also require that the board investigate, assess, and revise existing systems of oversight monitoring and communication in an effort to prevent the nondisclosure of operational risks in the future. These benefits are meaningful and justify an award of attorney fees.

### B. The Risks Involved and The Difficulty and Novelty of the Legal and Factual Issues

The court needs to look no further than its own order dismissing the shareholder derivative litigation to assess the risks involved. *Xcel Energy IV*, 222 F.R.D. at 608. Plaintiff had already lost once. Whether she would have prevailed at the Eighth Circuit is now a matter of unnecessary speculation. Even if she had prevailed on appeal, plaintiff would have faced many hurdles in continued litigation, including whether defendants' misconduct

was protected by Minn.Stat. § 300.64, subd. 4. Thus, the risks involved fully support the attorney fee award.

### C. The Skill of Counsel

Plaintiff's counsel have substantial experience in complex class and derivative litigation here and around the nation. Their experience inevitably led to a successful result, despite its dismissal and the pending appeal.

### D. The Time and Labor Involved

Plaintiff's counsel spent a total of 1,081.90 hours litigating this case here and at the Eighth Circuit, resulting in a lodestar of $540,452.[10] As in the other actions, all counsel litigated the Derivative Action in an efficient and just manner, which supports the award of attorney fees.

### E. The Reaction of the Class

Like the ERISA Action, no class member objected to the attorney fees provision in the settlement agreement. This factor thus supports the award.

### F. The Comparison to Similar Cases

Although not many cases exist to which a comparison can be made, the court determines that *Nyman* is a distinguishable outdated lodestar precedent that, by its differences, nevertheless supports the award of attorney fees. The *Nyman* court rejected a request that it award the lodestar of $303,299.65 because that amount exceeded 100% of the recovery, making it an unreasonable request. The court reduced the fee to $165,000, which was "reasonable compensation." 1981 WL 1705, at *3. Unlike that case, plaintiff's counsel here are not seeking lodestar, and although the settlement has no cash compo-

nent, counsel still achieved a settlement that conferred significant benefits to the class.

In sum, the court concludes that the combined attorney fee and cost award of $250,000 to plaintiff's counsel in the Derivative Action is just and reasonable.

### CONCLUSION

For the foregoing reasons, and based upon a thorough review of the record and case law, the court has determined that the requested attorney fees, reimbursement of expenses and awards to lead and representative plaintiffs are fair and reasonable and will be approved. Accordingly, **IT IS HEREBY ORDERED that:**

1. As to the Securities Action, the motion for attorney fees, expense reimbursement, and lead plaintiff awards [Docket No. 169] is granted. Plaintiffs' Co-Lead Counsel are awarded twenty-five percent (25%) of the settlement fund, or $20 million, plus interest at the same rate earned by the $80 million settlement fund. The award of attorney fees shall be allocated among Plaintiffs' counsel by Plaintiffs' Co-Lead Counsel in a manner that fairly compensates counsel for their respective contributions in the prosecution of this litigation. Plaintiffs' counsel are also awarded $481,422.94 to reimburse them for costs and expenses, plus $100,000 as an award to Lead Plaintiffs. These amounts shall be paid and distributed in accordance with the terms of the Securities Action settlement agreement.

2. As to the Securities Objections, the objections of Commonwealth of Pennsylvania Public Employees' Retirement System and Pennsylvania Municipal Retirement System; New York State Teachers' Retirement System; Public Employees Re-

---

10. Because this is not a percentage method common fund case, the court determines that a lodestar cross-check is unnecessary. Even it the court engaged in that process, the nego-

tiated fee is reasonable because it results in plaintiff's counsel receiving less than half of their lodestar.

tirement System of Idaho; Ron J. Park, Jr.; Robert P. and Carol L. Sabourin; Irene M. Zieske; and Ron Aumann are overruled.

3. As to the ERISA Action, the motion for attorney fees, expense reimbursement and representative plaintiff awards [Docket No. 155] is granted. Plaintiffs' counsel are awarded twenty-five percent (25%) of the $8 million settlement fund. Plaintiffs' counsel are also awarded costs of $66,780.30. The three representative plaintiffs each are awarded $2,000. These amounts shall be paid and distributed in accordance with the terms of the ERISA Action settlement agreement.

4. As to the Derivative Action, the motion for attorney fees and expense reimbursement [Docket No. 162] is granted. Plaintiff's counsel are awarded a total of $250,000 as attorney fees and costs. These amounts shall be paid and distributed in accordance with the terms of the Securities Action and Derivative Action settlement agreements.